RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0206p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

RUSSELL LEE COLLINS (12-6263); EDDIE WILBURN
(12-6512); RICHARD BROSKY (13-6617),

                *Defendants-Appellants.*

Nos. 12-6263/6512/13-6617

---

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:11-cr-00015—Gregory F. Van Tatenhove, District Judge.

Argued: November 19, 2014

Decided and Filed: August 24, 2015

Before: DAUGHTREY, CLAY and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:** Travis A. Rossman, JEWELL & ROSSMAN LAW OFFICE, Barbourville, Kentucky, for Appellant in 12-6263. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 12-6512. Mark A. Wohlander, WOHLANDER LAW OFFICE PSC, Lexington, Kentucky, for Appellant in 13-6617. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Travis A. Rossman, JEWELL & ROSSMAN LAW OFFICE, Barbourville, Kentucky, for Appellant in 12-6263. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 12-6512. Mark A. Wohlander, WOHLANDER LAW OFFICE PSC, Lexington, Kentucky, for Appellant in 13-6617. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

    CLAY, J., delivered the opinion of the court in which DAUGHTREY, J., joined, and COOK, J., joined in the result.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendants Russell Lee Collins, Eddie Wilburn, and Richard Brosky appeal from final judgments of the United States District Court for the Eastern District of Kentucky in a methamphetamine manufacturing and distribution conspiracy case.   Defendant Collins appeals from the judgment of the district court entered on October 2, 2012, sentencing him to 324 months of incarceration for violation of various statutes including 21 U.S.C. § 846. Defendant Wilburn appeals from the judgment of the district court entered on November 26, 2012, sentencing him to 360 months of incarceration for violation of various statutes including 21 U.S.C. § 846.   Defendant Brosky appeals from the judgment of the district court entered on December 2, 2013, sentencing him to 70 months of incarceration for violation of 21 U.S.C. § 846.    On appeal, Defendants raise a number of arguments, including challenges to the admissibility and sufficiency of evidence, prosecutorial misconduct, constitutional violations, and the reasonableness of their sentences.

For the reasons that follow, we **AFFIRM** the judgments of the district court.

**BACKGROUND**

**I.  Procedural History**

Defendants Russell Lee Collins, Eddie Wilburn, and Richard Brosky, as well as eight other individuals, were named in a superseding indictment filed in the United States District Court for the Eastern District of Kentucky on May 12, 2011, and charged with various offenses related to the manufacture and distribution of methamphetamine.   A number of the individuals named in the indictment entered plea agreements and agreed to cooperate with the government.

Defendants proceeded to trial on May 29, 2012.   On June 5, 2012, after a six-day trial, the jury entered its verdict.   Defendants were all found guilty of one count of conspiring to manufacture a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1).   The jury made a finding regarding the quantity of

methamphetamine involved for each defendant, attributing 500 grams or more of methamphetamine to Collins and Wilburn, and attributing less than 50 grams of methamphetamine to Brosky. The jury also found Collins and Wilburn guilty of conspiring to distribute more than 500 grams of a mixture or substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2), but found Brosky not guilty of that charge.

In addition to the manufacturing and distribution charges, the jury found Collins and Wilburn guilty of one count of possessing equipment used to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) (Count 5), and one count of conspiring to distribute a mixture or substance containing methamphetamine to persons under the age of twenty-one in violation of 21 U.S.C §§ 841(a)(1), 846, and 859(a) (Count 14). Wilburn was found guilty of one additional count of possessing equipment used to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) (Count 7). Collins was found not guilty of one count of transporting stolen anhydrous ammonia across state lines in violation of 21 U.S.C. § 864(a) and 18 U.S.C. § 2 (Count 6).

The district court sentenced Collins to concurrent terms of 324 months of incarceration on Counts 1, 2 and 14, in addition to a concurrent term of 120 months on Count 5. Wilburn was sentenced to concurrent terms of 360 months of incarceration on Counts 1, 2, and 14, and to concurrent terms of 240 months on Counts 5 and 7. Brosky was sentenced to 70 months of incarceration on Count 1, his sole count of conviction.

## II. Factual History

### A. Initial Investigation of Collins and Wilburn

On September 22, 2010, following an unrelated search, police officers found what they believed to be a methamphetamine laboratory in the woods near the residential compound where Wilburn and Collins lived. A hazmat technician was summoned and confirmed that the items found by the officers were used to manufacture methamphetamine. One of the officers, Detective Kelly Farris, subsequently searched Wilburn's trailer and discovered additional items typically associated with the manufacture of methamphetamine. Additionally, a tank of

anhydrous ammonia, which is used in the manufacture of methamphetamine, was found buried in a creek bed near Wilburn's trailer.

On February 17, 2011, Detective Farris and Special Agent Robert O'Neil conducted a home visit at Wilburn's trailer and found a one-step methamphetamine laboratory in the bathroom. They also found other materials used in the manufacture of methamphetamine both inside the trailer and outside the trailer, and observed that there were surveillance cameras set up on Wilburn's residence pointing to the driveway and towards Collins' trailer. No methamphetamine was found at the residence.

Although the conspiracy for which Defendants were indicted allegedly began in January 2009 and continued until April 2011, Collins and Wilburn were incarcerated on unrelated charges until January 2010 and June 2010, respectively. The government does not contend that these defendants participated in the conspiracy while incarcerated.

### B. Initial Investigation of Brosky

On November 16, 2010, Detective Farris conducted an investigation of Brosky's residence following a complaint received by the Knox County Police Department that there was a methamphetamine laboratory on a hill behind Brosky's house. Detective Farris and other officers found a number of items suspected of having been used to manufacture methamphetamine in an orchard behind Brosky's home. Detective Farris also found a video camera overlooking the apple orchard that was hard-wired back to Brosky's home and to a monitor in his bedroom. No methamphetamine was found at the residence. On the basis of this search, Detective Farris arrested Brosky and his wife.

### C. Testimony of Government Witnesses

At trial, the government presented testimony from multiple witnesses, a number of whom were also named in the indictment or were facing other charges and agreed to cooperate with the prosecution. Many of these witnesses were "smurfs"—individuals who claimed to have provided Collins and Wilburn with certain over-the-counter medications in exchange for methamphetamine. The active ingredient of these medications is pseudoephedrine, a precursor necessary for the production of methamphetamine. Government witnesses also testified that

Collins and Wilburn had a practice of trading methamphetamine for sex, cash, and valuable items.

Few witnesses provided testimony regarding the total amount of methamphetamine allegedly produced by the conspiracy, though some, including Leya Stapleton and Kimberly Griffith, testified that they would obtain quarter to half grams of methamphetamine from the Defendants with some frequency. Mickey Brown testified that he helped Collins and Wilburn "cook" methamphetamine for approximately seven months of the conspiracy, claiming that he was present on 20 to 30 occasions during which Collins and Wilburn produced anywhere from 16 to 34 grams of methamphetamine each time. Brown and Charles Skaggs, another government witness, testified that Brosky occasionally cooked methamphetamine with Wilburn and Collins.

Agent O'Neil provided testimony at trial regarding pseudoephedrine purchase records from January 2009 through April 2011 of individuals associated with the conspiracy. These records were created and stored by a company called MethCheck. Agent O'Neil testified that the purchases for this time period equaled 1,335 grams of pseudoephedrine. In his testimony, Agent O'Neil conceded that some portion of the pseudoephedrine represented in these records may have been provided to different methamphetamine "cooks" unrelated to the present conspiracy. Agent O'Neil, who was qualified as an expert, also testified regarding the possible conversion ratios between pseudoephedrine and methamphetamine. Throughout the trial, Defendants raised objections to the admissibility of the pseudoephedrine purchase records and to Agent O'Neil's testimony regarding conversion ratios. These objections were overruled.

Collins made multiple objections throughout the trial concerning the admissibility of evidence that overlapped with evidence previously presented at the trial of an unrelated methamphetamine manufacturing operation. The methamphetamine cooks for that operation, Darlene and Roscoe Smith, were convicted on March 1, 2012 of conspiring to manufacture at least 500 grams of a mixture or substance that contained methamphetamine. Many of the government's witnesses in the Smith case also testified against Defendants, and there was

significant overlap between the pseudoephedrine purchase records admitted into evidence at both trials.[1]

## DISCUSSION

### I. Brosky's Destruction of Evidence Claim

This Court has applied an inconsistent standard when reviewing a motion to dismiss a defendant's indictment due to the government's failure to preserve exculpatory evidence. *United States v. Grenier*, 513 F.3d 632, 635 (6th Cir. 2008) ("The standard of review to be applied for a motion to dismiss an indictment is somewhat unclear."). We have previously reviewed such motions *de novo* and for clear error. *Compare United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (applying *de novo* review to a district court's denial of a motion to dismiss a defendant's indictment on the ground that the government failed to preserve exculpatory evidence), *with United States v. Cody*, 498 F.3d 582 (6th Cir. 2007) (reviewing for clear error a district court's denial of a defendant's motion to dismiss an indictment where the government lost or destroyed exculpatory evidence). Brosky's challenge fails under either standard of review.

Brosky's motion to dismiss is based on the government's alleged destruction of evidence obtained during the November 2010 search of Brosky's residence and a nearby orchard. Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "[T]he Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence" in order to protect this Fourteenth Amendment right. *Id.* (internal quotation marks omitted). The Supreme Court has established two tests to determine whether a government's failure to preserve evidence amounts to a due process violation. The first test, established in *Trombetta*, applies in cases where the government fails to preserve material exculpatory evidence, while the second test, established in *Arizona v. Youngblood*, 488 U.S. 51 (1988), applies in cases where the government fails to preserve "potentially useful" evidence. *Wright*, 260 F.3d at 570.

---

[1] The Smiths appealed their sentences and convictions. On November 6, 2013, a panel of this Court affirmed their sentences. *United States v. Smith*, Nos. 12-5895, 12-5896 (6th Cir. Nov. 6, 2013) (unpublished).

Under *Trombetta*, to be deemed constitutionally material, evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. In such cases, "[t]he destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith." *Wright*, 260 F.3d at 571. Meanwhile, under the *Youngblood* standard, in cases "where the government fails to preserve evidence whose exculpatory value is indeterminate and only potentially useful," the defendant must demonstrate:

> (1) that the government acted in bad faith in failing to preserve the evidence;
> (2) that the exculpatory value of the evidence was apparent before its destruction;
> and (3) that the nature of the evidence was such that the defendant would be
> unable to obtain comparable evidence by other reasonably available means.

*United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (citing *Youngblood*, 488 U.S. at 57-58). In order to establish bad faith, "a defendant must prove official animus or a conscious effort to suppress exculpatory evidence." *Id*. (internal quotation marks omitted).

Brosky argues that government agents impermissibly destroyed equipment suspected of being used to manufacture methamphetamine before that equipment could be tested for fingerprints that might have linked it to an individual named Joseph Ore rather than to Brosky. Joseph Ore had been living with Brosky during 2009 and had previously been arrested for manufacturing methamphetamine. Brosky argues that local law enforcement officers "concealed knowledge about the true ownership of the items discovered" during the search. *Brosky's Br.* at 26. The government contends that any evidence obtained from the equipment could "just as easily" have been considered "inculpatory as exculpatory" and that officers' public health and safety concerns counseled in favor of destroying any materials related to the manufacture of methamphetamine. *Appellee's Br*. at 25.

The district court denied Brosky's motion to dismiss, noting that despite Brosky's focus on Joseph Ore's previous criminal history, "there is nothing about the existence of a methamphetamine lab near his own home that could possibly be favorable to Brosky." (R. 343, Memorandum Opinion and Order, Page ID # 1496.) Having determined that the physical evidence at issue in this motion did not constitute material exculpatory evidence, the district

court further held that Brosky "failed to argue that the government acted in bad faith when it destroyed the lab" and that this destruction cannot therefore form the basis of denial of the due process claim for destruction of "potentially useful evidence." (*Id*. at 1497.)

Regardless of whether we apply a *de novo* or clear error standard of review, the district court did not err in denying Brosky's motion to dismiss. First, the *Trombetta* test does not apply in this case since the equipment destroyed by the government does not constitute material exculpatory evidence. The evidence at issue here lacked "exculpatory value that was apparent before the evidence was destroyed." *Trombetta*, 467 U.S. at 489. Second, Brosky has failed to establish a due process violation under *Youngblood*. In addition to the fact that there is no apparent exculpatory value to the destroyed items, Brosky has not shown that any evidence was destroyed because of "official animus" or a "conscious effort to suppress exculpatory evidence," as required to establish a due process violation under *Youngblood*. *Jobson*, 102 F.3d at 218. Consequently, the district court did not err by denying Brosky's motion to dismiss his indictment on the ground that law enforcement destroyed exculpatory evidence.

## II. Evidentiary and Trial Issues

### A. Collins' Impeachment with Evidence of Past Conviction

We review a district court's decision to allow impeachment evidence for abuse of discretion. *United States v. Meyers*, 952 F.2d 914, 916 (6th Cir. 1992). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Geier v. Sundquist*, 372 F.3d 784, 789-90 (6th Cir. 2004). A district court that has conducted the necessary probative value versus prejudicial effect inquiry "has broad discretion to admit evidence of prior convictions" under Rule 609(b) of the Federal Rules of Evidence. *United States v. Sloman*, 909 F.2d 176, 181 (6th Cir. 1990). Even where the reviewing court "concludes that the district court's ruling was erroneous, the defendant must demonstrate substantial prejudice to be entitled to a reversal." *Id.*

A defendant who chooses to testify at his criminal trial is subject to impeachment on cross-examination. Under Federal Rule of Evidence 609, the district court must admit evidence of a past criminal conviction for any crime that has as an element a dishonest act or false

statement.   Fed. R. Evid. 609(a)(2).   More stringent limitations apply to the admission of evidence of a past criminal conviction if more than ten years have passed since the witness' conviction or release from confinement.   In such circumstances, the evidence of conviction is only admissible if:

> (1)  its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
> (2)  the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Fed. R. Evid. 609(b).

Convictions that are more than ten years old "should be admitted very rarely and only in exceptional circumstances." *Sloman*, 909 F.2d at 181 (quoting *United States v. Sims*, 588 F.2d 1145, 1147 (6th Cir. 1978)).   In order to admit such evidence, "a court must make an on-the-record finding based on the facts that the conviction's probative value substantially outweighs its prejudicial impact." *Meyers*, 952 F.2d at 917.   This hearing on the record, which "need not be extensive," should include a consideration of the following factors:

> (1) The impeachment value of the prior crime.
> (2) The point in time of the conviction and the witness' subsequent history.
> (3) The similarity between the past crime and the charged crime.
> (4) The importance of the defendant's testimony.
> (5) The centrality of the credibility issue.

*Sloman*, 909 F.2d at 181.

The district court abused its discretion by applying an incorrect legal standard in admitting Collins' past conviction as impeachment evidence.   However, this error was harmless in light of the substantial evidence against Collins and the limited prejudicial potential of this past conviction.   After Collins announced his intention to testify, the government stated its intention to impeach him with a 15-year-old Class B Misdemeanor for giving a false name to a police officer under Kentucky Revised Statutes § 523.110.   Collins' counsel objected to the introduction of this evidence absent prior written notice.   The following day, the district court concluded that it would consider the admissibility of Collins' prior conviction despite the lack of written notice, finding that the lack of notice was harmless because Collins' counsel knew about Collins' criminal history.

Rather than applying the Rule 609(b) analysis whereby the court determines whether a stale conviction's probative value *substantially outweighs* its prejudicial impact, the district court erroneously applied Rule 403 of the Federal Rules of Evidence.  Under Rule 403, a court will exclude relevant evidence if its probative value *is substantially outweighed by* its unfair prejudicial effect.  Fed. R. Evid. 403.  Upon undertaking this analysis, the district court concluded that it could not find that the evidence of Collins' prior crime was "so prejudicial that it ought not be allowed," because it is the type of conviction that goes "directly to the witness's v[e]racity and his truthfulness."  (R. 703, Transcript of Day 6 of Jury Trial, Page ID # 8353-4.)[2]

By applying the more permissive Rule 403 standard, the district court failed to undertake the requisite probative value versus prejudicial effect balancing, and in fact turned the Rule 609(b) analysis on its head.  Accordingly, the district court abused its discretion by allowing the government to introduce evidence of Collins' prior conviction for the purposes of impeachment.

Nonetheless, the district court's error in applying an incorrect evidentiary rule was harmless.  In cases where evidence of the defendant's participation in the crime is overwhelming, we have found that the erroneous admission of a stale conviction is harmless error.  *See Sloman*, 909 F.2d at 181.  Collins must show "substantial prejudice to be entitled to a reversal."  *Id*. There was overwhelming evidence in this case of Collins' involvement in the conspiracy. Moreover, the potential prejudice of admitting this evidence is limited for the same reason that its probative value is limited—it had been 15 years since his conviction and he had had no subsequent similar convictions.

In sum, while Collins' prior conviction may have been inadmissible under a Rule 609(b) analysis, in light of the overwhelming testimony against Collins and the limited prejudicial impact of the conviction, the district court's error in applying a Rule 403 analysis and admitting the conviction into evidence was harmless.

---

[2]The court subsequently gave a limiting instruction to the jury, instructing them that the "earlier conviction was brought to your attention only as a way of helping you decide how believable [Collins'] testimony was. You cannot use it for any other purpose." (R. 703, Transcript of Day 6 of Jury Trial, Page ID # 8582.)

**B. Expert Witness Disclosures**

We review a district court's admission or exclusion of evidence for abuse of discretion. *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006). Defendants argue that the district court abused its discretion by allowing the government's proposed expert witnesses to testify despite the government's deficient expert witness disclosures. We disagree.

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government must, at a defendant's request, "give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." The summary required by this rule "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

Where the government has failed to comply with this disclosure requirement, the district court may:

(A)     order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
(B)     grant a continuance;
(C)     prohibit that party from introducing the undisclosed evidence; or
(D)     enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2). We have previously identified three factors for a reviewing court to consider in determining whether "suppression of evidence is an appropriate remedy to be imposed" for a disclosure violation:

(1)     the reasons for the government's delay in producing the materials, including whether it acted intentionally or in bad faith;
(2)     the degree of prejudice, if any, to the defendant; and
(3)     whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or a recess.

*United States v. Davis,* 514 F.3d 596, 611 (6th Cir. 2008) (internal quotation marks omitted).

"Suppression of evidence must be viewed as an undesirable remedy for a discovery violation reserved for cases of incurable prejudice or bad faith conduct demanding punishment by the court." *Id*. (internal quotations marks omitted). Courts should impose "the least severe

remedy available to cure prejudice" where a potential Rule 16 violation has occurred. *United States v. Maples*, 60 F.3d 244, 247 (6th Cir. 1995).

The government in this case filed its initial disclosure of expert witnesses for three potential witnesses on Friday, May 25, 2012—five days before the trial was scheduled to begin. Defendants had requested the government's expert disclosures fourteen months earlier but had not received them. In discussing the timing of the government's disclosure, the district judge commented, "I don't know if there's a phrase that captures something later than the 11th hour, but it appears that it would be appropriate to apply that phrase to this case." (R. 680, Partial Transcript of Day 1 of Jury Trial, Page ID # 3231.) The prosecutor admitted that he had simply forgotten to file the disclosures. In addition to the government's significant delay in filing its disclosures, the district court found that the disclosures themselves were substantively deficient because they lacked specificity and included fairly boilerplate language to describe the experts' qualifications.

Based on these deficiencies, Defendants orally moved the court to prohibit the government from introducing the testimony of the three witnesses. Finding the remedy of excluding the testimony to be unnecessarily extreme, the district court sought to "fashion a remedy that addresses the concerns that are raised by the defense in terms of the late and cursory notice that's been given in this case, but something short of disallowing the testimony to occur." (R. 713, Partial Transcript of Day 1 of Jury Trial, Page ID # 8803.) The district court determined that the defense would not be significantly prejudiced by the government's error, noting that the experts' potential testimony related to drug quantities and that "this case is largely about drug quantity . . . so it's not surprising that there would be expert testimony as it relates to drug quantity in this case." (*Id.* at 8804.) Determining that a less drastic course of action was possible, the district court denied Defendants' motion to exclude the witnesses and instead required the government to produce complete expert disclosures the following day and to introduce the witnesses later in the week. The district court further explained that, following defense counsel's receipt of the government's complete disclosures, it would entertain motions regarding the adequacy of the district court's proposed schedule. Specifically, the court suggested that it could "recess early one day to give counsel a little bit of [] extra time" and

would consider making determinations regarding the order in which the government presented its evidence. (*Id*. at 8817).

The district court weighed the appropriate considerations regarding the nature of the Rule 16 violation and the potential prejudice facing Defendants. In so doing, the district court sought a less extreme solution than excluding the government's expert witnesses altogether and invited Defendants to file additional motions regarding the feasibility of the court's proposed solution. Defendants chose not to avail themselves of the opportunity to seek further remedies, including a continuance that might have allowed them to prepare rebuttal testimony. Having given Defendants additional time to review the disclosures as well as inviting Defendants to request additional time and/or other accommodations, the district court acted within its discretion in denying Defendants' motion to exclude the government's witnesses on the basis of the government's Rule 16 violation. It was not an abuse of discretion for the district court to apply a less severe remedy to address the government's inadequate expert disclosures.

### C. Qualification of Agent O'Neil as an Expert Witness

### Preservation of the Issue

Collins failed to preserve his objection to Agent O'Neil's expert witness qualifications for appeal. Collins contends that the objection was preserved by a co-defendant's objection, which he joined, on the first day of jury selection. In a lengthy exchange, Defendants raised concerns regarding the qualifications of Agent O'Neil and one other witness to testify regarding scientific issues, stating: "They want to testify to how much meth could be made from different things, and neither, I believe, none of them are qualified for that." (R. 680, Partial Transcript of Day 1 of the Jury Trial, Page ID # 3206.) The district court determined that Defendants would have an opportunity to question Agent O'Neil about his background and expertise before the court qualified him as an expert witness.

After questioning Agent O'Neil, Defendants failed to assert an objection and actively chose not to object to Agent O'Neil's qualifications when explicitly invited to do so by the district court. Rather, Brosky's attorney stated, "I'd certainly like to make an objection, but I think he's going to be in the ballpark as far as that, [] I think we're going to probably at some

point in time ask for a more specific jury instruction [regarding his testimony]." (R. 702, Trial Tr., Page ID # 8108.)   Collins' attorney then clarified that defense might ask for a jury instruction regarding the pseudoephedrine conversion ratio to which Agent O'Neil was testifying, "because if - - he's qualified as an expert, I think for the purposes of trial, he's pretty close to it." (*Id*.)   When the district court then sought confirmation that "there's no objection to moving forward with regard to [Agent O'Neil's qualification]," Collins' attorney failed to object, and Brosky's attorney replied, "I don't think I can.  I mean, I've looked at all the case law." (*Id.* at 8108-9.)   Following this exchange, the government moved to qualify O'Neil as an expert witness in open court and none of the defense attorneys objected.  Therefore, despite the earlier objections raised by defense counsel prior to the initial questioning of Agent O'Neil, Collins did not preserve this issue for appeal.

**Standard of Review**

We generally review a district court's decision to admit proposed expert testimony for abuse of discretion.  *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012).  However, because Defendants failed to preserve this issue for appellate review, we review the district court's decision to permit Agent O'Neil to testify as an expert for plain error.  *United States v. Smith,* 601 F.3d 530, 538 (6th Cir. 2010) ("[T]his court reviews issues involving the admissibility of expert testimony for plain error where no objection was made at trial." (internal quotation marks omitted)).  To establish plain error, a defendant must demonstrate:

> (1) error, (2) that was plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.

*United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007) (internal quotation marks omitted).

**Analysis**

The district court did not plainly err by finding that Agent O'Neil was qualified to testify as an expert regarding the manufacture of methamphetamine.   The government sought to establish the quantity of methamphetamine involved in Defendants' conspiracy indirectly by introducing evidence of pseudoephedrine purchases made by Defendants' associates.

Pseudoephedrine is a necessary precursor for the manufacture of methamphetamine.  Agent O'Neil offered testimony regarding how much methamphetamine can be produced from a given quantity of pseudoephedrine (the "conversion ratio").[3]  Collins argues that the district court should not have allowed Agent O'Neil to testify regarding the conversion ratio.  While acknowledging Agent O'Neil's expertise in investigating and dismantling methamphetamine laboratories, Collins argues that this experience does not qualify Agent O'Neil as an expert in the chemistry behind methamphetamine production.  Citing to no relevant case law, Collins specifically points to Agent O'Neil's lack of college education and formal chemistry training as evidence of his lack of expertise.

Despite Agent O'Neil's lack of formal chemistry instruction, he has significant on-the-job experience and training pertaining to methamphetamine manufacturing.  Agent O'Neil testified that he had participated in more than 500 methamphetamine investigations and had dismantled more than 1,000 methamphetamine laboratories.  In order to join the Two Rivers Drug Task Force, Agent O'Neil completed advanced methamphetamine training as well as a clandestine drug laboratory course, in which he was required to successfully produce methamphetamine.  This course also provided Agent O'Neil with training regarding the conversion of pseudoephedrine to methamphetamine.  Agent O'Neil testified that the regular re-certification training he receives specifically covers these conversion ratios.

We "regularly allow[] qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given . . . ."  *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004).  Given Agent O'Neil's experience and relevant training, the district court did not commit error, let alone plain error, by allowing Agent O'Neil to testify as an expert regarding the manufacture of methamphetamine.

---

[3]Agent O'Neil testified that a nearly 1:1 conversion of pseudoephedrine to methamphetamine may be possible, but stated that a conversion rate of 50 to 75 percent was typical and that the conversion ratio in the present case could have been even lower.

**D.  Agent O'Neil's Reliance on Out-of-Court Statements**

**Preservation of the Issue**

Collins challenges Agent O'Neil's testimony about the conversion ratio on the grounds that the testimony was based on out-of-court statements in violation of the Confrontation Clause and the rule against hearsay.  Collins acknowledges that he failed to raise either a hearsay or Confrontation Clause objection at trial and therefore did not preserve either challenge for appeal.

**Standard of Review**

Due to Collins' failure to preserve this issue for appeal, we review Collins' hearsay and Confrontation Clause claims for plain error.  *United States v. Baker*, 458 F.3d 513, 517 (6th Cir. 2006) ("When a party fails to object to evidence at the trial court, his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice." (internal quotation marks omitted)). To satisfy plain-error review, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights."  *Id.* (internal quotation marks omitted).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if [] the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Johnson,* 488 F.3d at 697.

**Analysis**

The district court did not plainly err by admitting Agent O'Neil's testimony regarding conversion ratios between pseudoephedrine and methamphetamine.

When questioned about possible conversion ratios, Agent O'Neil made reference to information he learned from people he caught manufacturing methamphetamine as the basis for his position that a one-to-one conversion ratio may be possible:

> Q. In regards to that method, based on your training and expertise, what [are] the conversion ratios you've encountered for pseudoephedrine over to methamphetamine?
>
> A. Oh, that I've actually encountered is—you know . . . during the interviews of some of these people that I've caught manufacturing meth, a lot of them have told

me if you know what you're doing, that you'll get one for one.  If you use 2.4 grams of pseudoephedrine, you can pull 2.4 grams of meth.  But now what that is, is a mixture of methamphetamine, and your purity level is going to go down.

(R. 702, Transcript of Day 5 of Jury Trial, Page ID # 8146-47.)   Collins challenges the admissibility of this testimony on the theory that it violated both the Confrontation Clause and the rule against hearsay.  Collins argues that the people to whom Agent O'Neil referred in this testimony have never been identified and that the admission of their views amounts to the admission of testimonial out-of-court statements for the truth of the matter asserted.

### 1.  Confrontation Clause

The Confrontation Clause of the Sixth Amendment "guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'"  *United States v. Johnson*, 581 F.3d 320, 324 (2009) (quoting U.S. Const. amend. VI).  The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004).  For a statement to be considered "testimonial" under the Confrontation Clause, the declarant must have "intend[ed] to bear testimony against the accused."  *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  This determination "depends on whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."  *Johnson*, 581 F.3d at 325 (internal quotation marks omitted).  There is no evidence that the suspected methamphetamine manufacturers Agent O'Neil questioned throughout his career "intended to bear testimony" against Collins or his co-defendants.  Consequently, the admission of Agent O'Neil's testimony did not violate Collins' rights under the Confrontation Clause.

### 2.  Rule Against Hearsay

The rule against hearsay bars the admission of out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c), 802.  Although Agent O'Neil's testimony was based on out-of-court statements made by third parties suggesting that a one-to-one conversion ratio was possible, the government argues that this testimony was not admitted for the truth of the matter asserted because Agent O'Neil later testified that the average conversion

ratio was lower than one-to-one. This argument lacks merit. Identification of a correct conversion ratio was a core issue at trial since the amount of methamphetamine produced by Defendants was proven in part by the amount of pseudoephedrine received by Defendants. Agent O'Neil's testimony, in which he made multiple references to out-of-court statements made by unidentified people, was expressly elicited by the government to establish potential conversion ratios to be used in this case. This testimony therefore does violate the rule against hearsay.

Nonetheless, Collins has failed to demonstrate that the court plainly erred by admitting this testimony. In order to establish that a plain error has occurred, Collins must show that the error affected his substantial rights. *Baker*, 458 F.3d at 517. This he cannot do. While Collins contests only the portion of Agent O'Neil's testimony that refers to the possibility of achieving a one-to-one conversion ratio, Agent O'Neil also testified that the maximum conversion ratio is 92 percent, that the average conversion ratio in the region was 50 to 75 percent, and that the ratio in this case may be even lower. Furthermore, in its closing argument, the government specifically referenced the typical conversion rate of 50 to 75 percent, and did not claim that a one-to-one ratio might be possible. Consequently, Collins has not demonstrated that Agent O'Neil's introduction of inadmissible out-of-court statements substantially affected his rights.

In sum, the district court did not commit plain error by admitting portions of Agent O'Neil's testimony that included out-of-court statements made by unidentified individuals. The admission of these statements did not violate the Sixth Amendment's Confrontation Clause and, while these statements constituted inadmissible hearsay, Collins is unable to demonstrate that any of his substantive rights have been affected by this testimony.

**E. Relevance of Pseudoephedrine Purchase Records**

A district court's relevance determinations are reviewed for abuse of discretion. *United States v. Hanna*, 661 F.3d 271, 288 (6th Cir. 2011). Additionally, when reviewing the trial court's decision for abuse of discretion, "[we] must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum prejudicial value." *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003).

Under the Federal Rules of Evidence, "irrelevant evidence is not admissible" at trial. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. This Circuit applies an "extremely liberal" standard for relevancy. *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006).

Collins argues that the district court abused its discretion by admitting three categories of irrelevant evidence: (1) wholly irrelevant pseudoephedrine transactions of several witnesses who did not testify; (2) "pseudoephedrine transactions that occurred while Collins was in jail on unrelated charges without an instruction limiting the consideration of these transactions vis-à-vis Collins"; and (3) pseudoephedrine transactions from a rival conspiracy. *Collins' Br.* at 44-52. We disagree.

### 1. Transactions of Witnesses Who Did Not Testify

The government introduced the pseudoephedrine purchase records of multiple witnesses who did not testify at trial. Collins challenges the introduction of the purchase records of Christina Doss and Sonoma Carson on the ground that their purchases were "tied to the conspiracy with a weak or nonexistent foundation for relevancy." *Collins' Br.* at 48. While Collins also asserts that there were deficient foundations for the introduction of pseudoephedrine purchases made by other witnesses, he provides no support for these conclusory assertions and we do not consider them.

### a. Christina Doss

Christina Doss did not testify at trial and was not named in the indictment. Nevertheless, Agent O'Neil testified that she had purchased 44.88 grams of pseudoephedrine, which he included in his calculation of the total amount of pseudoephedrine deemed potentially attributable to the conspiracy. The following references were made to Doss during the trial:

(1) Charles Skaggs testified on Day 2 of the trial that Doss was a young girl who was present in the company of Collins and Wilburn. When he was asked if he ever saw Doss and her friends give anything to Collins or Wilburn, he testified "I never seen them give them nothing." (R. 699, Transcript of Day 2 of Jury Trial, Page ID # 7519-20.)

(2) Kelly Farris testified that Doss was present at Wilburn's residence when he performed a search and found incriminating items. (R. 701, Transcript of Day 4 of Jury Trial, Page ID # 7925.)

(3) Agent O'Neil testified that Doss was present at the residence when the residence was searched and the police found items associated with the manufacture of methamphetamine. (R. 702, Transcript of Day 5 of Jury Trial, Page ID # 8114.)

Despite the lack of direct evidence establishing that Doss traded pseudoephedrine for methamphetamine, the testimony of multiple witnesses placing her in the company of Defendants where methamphetamine was allegedly being manufactured and her significant pseudoephedrine purchase history are enough to satisfy this Circuit's "extremely liberal" relevancy standard. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009).

### b. Sonoma Carson

Like Christina Doss, Sonoma Carson did not testify at trial. Agent O'Neil introduced records of her purchase of 24.24 grams of pseudoephedrine during his testimony. Additionally, the government presented evidence that Sonoma Carson had purchased pseudoephedrine that was used in the alleged conspiracy through the testimony of Leya Stapleton. Stapleton testified that Carson sold her pseudoephedrine, which Stapleton then traded to Wilburn for methamphetamine. Regardless of Stapleton's role as a middle man between Carson's pseudoephedrine and Wilburn's methamphetamine, this testimony is sufficient to establish a basis for the conclusion that Carson's pseudoephedrine is connected to the alleged conspiracy.

The government presented sufficient testimony to tie both Sonoma Carson and Christina Doss to Defendants' conspiracy. Consequently, the district court did not abuse its discretion by permitting the introduction of both individuals' pseudoephedrine purchase records.

### 2. Pseudoephedrine Transactions That Occurred While Collins Was in Jail

The indictment alleged that Defendants' conspiracy extended from January 2009 to April 2011. Collins was incarcerated from November 2008 until mid-January 2010 on unrelated charges, and Wilburn was in custody until June 25, 2010. Collins argues that "his only opportunity to participate in the conspiracy was from January 14, 2010 until April 2011," and

that pseudoephedrine purchases made prior to this period should have been excluded. *Collins'*
*Br.* at 50.

In *United States v. Robinson*, a case involving a conspiracy to distribute marijuana and
cocaine, we considered a similar challenge to evidence of activities that occurred prior to a
defendant's participation in the conspiracy. 390 F.3d 853, 882 (6th Cir. 2004). We rejected the
defendant's argument, recognizing that "'[i]t has long been established that a conspirator may
join a conspiracy already in progress and be held responsible for actions done in furtherance of
the conspiracy before he joined." *Id.* (quoting *United States v. Gravier*, 706 F.2d 174, 177 (6th
Cir. 1983)); *see also United States v. Cimini*, 427 F.2d 129, 130 (6th Cir. 1970) ("The rule is that
where a conspiracy is already in progress, a late comer who knowingly joins it takes it as he
finds it and he may be held responsible for acts committed in furtherance of the conspiracy
before he joined it."). Under this precedent, the pseudoephedrine purchases of Collins' co-
conspirators that occurred in 2009 may be admissible to establish the existence and nature of the
conspiracy, even absent evidence that Collins and Wilburn joined the conspiracy before their
respective releases from incarceration.

Collins further argues that since the government's witnesses identified Collins and
Wilburn as the "cooks" of the conspiracy, it was impossible that the conspiracy manufactured
methamphetamine prior to his release from incarceration in January 2010. Despite Collins'
assertion that the conspiracy could not have existed without his participation, the indictment
identified a total of eleven people in the conspiracy charges, and pseudoephedrine purchases of
Defendants' associates from 2009 are relevant in establishing the existence of the conspiracy.
Furthermore, the testimony of government witnesses suggested that other participants in the
conspiracy, including Brosky, may have "cooked" methamphetamine as well. Consequently, it
was not an abuse of discretion for the district court to admit as relevant pseudoephedrine
purchases from 2009.

### 3. Pseudoephedrine Transactions from a Rival Conspiracy

Collins argues that the government introduced evidence of pseudoephedrine purchases
that were irrelevant to the Defendants' conspiracy because they were used in an unrelated
conspiracy. At trial, Agent O'Neil testified about the amount of pseudoephedrine purchased by

multiple individuals associated with the Defendants' conspiracy and calculated the sum of these purchases to be 1,335 grams of pseudoephedrine.  On direct examination, the government asked Agent O'Neil, with regards to the individuals he had just named, "in the course of your investigations, have you encountered other individuals in Knox County who may have received the pseudoephedrine from these individuals?"  (R. 702, Transcript of Day 5 of Jury Trial, Page ID # 8145.)  The prosecutor then clarified and asked, with regards to a separate conspiracy known as the Smith conspiracy, "based on your investigation, could they have received some items from the people on this list too?"  (*Id.* at 8145-46.)  Agent O'Neil replied, "Yes, they could have."  (*Id.* at 8146.)

During cross-examination by Wilburn's attorney, Agent O'Neil again admitted that some unspecified portion of the total 1,335 grams was provided to the Smith conspiracy, rather than the Defendants' conspiracy:

Q. Okay. And [] do you recall the time frame of the conspiracy in the [Roscoe] and Darlene Smith case?

A. I do not know the exact dates off the top of my head, no, sir.

Q. Would there have been overlap with this case?

A. Yes. There would have been overlap with this case.

Q. And some of the witnesses who testified in this trial supplied seed to [Roscoe] and Darlene Smith?

A. Some of the witnesses that testified in this trial?

Q. Well, let me just—let me just rephrase that. Some of the people that were on your list, some 30 people that you just testified to, did some of those people supply seed to [Roscoe] and Darlene Smith?

A. Yes. Some of the people—the names that I read today did supply pseudoephedrine to [Roscoe] and Darlene Smith as well, yes, sir.

Q. Okay. And were [Roscoe] and Darlene Smith convicted in that case?

A. Yes, they were.

Q. And were they convicted of manufacturing more than 500 grams of methamphetamine?

A. Yes, sir, they were.

Q. Okay. So an unknown portion of this 1,335 grams of [pseudoephedrine] was used in the manufacturing [of] more than 500 grams of methamphetamine by [Roscoe] and Darlene Smith; is that a fair statement?

A. Yes. Some of the people on the list that I read did take pseudoephedrine to [Roscoe] and Darlene Smith as well.

Q. Well, so it's a fair statement that some portion of this 1,335 grams was actually used in manufacturing by [Roscoe] and Darlene Smith, who have been convicted of meth manufacturing more than 500 grams?

A. Yes, sir, that's a fair statement.

Q. Okay. And you really don't know how much of that was actually used by [Roscoe] and Darlene Smith?

A. No, sir, I do not.

(*Id.* at 8161-63.)

Collins' relevancy argument is based on his contention that "[i]t is a mathematical certainty that some of the pseudoephedrine transactions counted against the Smith conspiracy were counted against Collins." *Collins' Br.* at 47. This assertion is false. Even if there was a 100 percent overlap between the pseudoephedrine purchase records admitted in the Smith trial and the records admitted in the present trial, it was possible for the jury to convict Collins without counting any of the pseudoephedrine purchases necessarily relied upon in the Smith trial against him. The jury was told by Agent O'Neil that the typical conversion ratio was 50 to 75 percent, which was later repeated to them by the prosecution during closing arguments. The application of a 75 percent conversion ratio to 1,335 grams of pseudoephedrine results in 1,001 grams of methamphetamine, which is enough, though just barely, to establish two separate conspiracies involving 500 grams or more of methamphetamine.

There is no question that any pseudoephedrine that was unambiguously used by the rival Smith conspiracy would not be relevant to establishing the quantity of methamphetamine produced by Defendants' conspiracy. However, the challenged pseudoephedrine purchases of Collins' associates were not unambiguously used by the rival Smith conspiracy and are, therefore, still relevant to establishing Defendants' conspiracy.

**F. Due Process Claims Related to the Smith Conspiracy**

**Preservation of the Issue**

Collins argues that his due process rights were violated by the admission of evidence that was attributable to the Smith conspiracy and by the fact that his jury pool overlapped with the jury pool in the Smith trial. Collins did not raise these due process arguments below and thereby failed to preserve them for appellate review.

**Standard of Review**

"Where, as here, a defendant failed to make an objection below, the claim of prosecutorial misconduct is reviewed for plain error." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). "Plain error review applies even if the forfeited assignment of error is a constitutional error." *Cromer*, 389 F.3d at 672. As has already been stated, plain error occurs when there is an "(1) error (2) that was plain, and (3) that affects substantial rights . . . but only if . . . the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Johnson*, 488 F.3d at 697.

**Analysis**

The district court did not commit plain error by admitting evidence that was also introduced in the Smith trial, or by allowing jurors who may have been in the Smith trial's jury pool to serve on the jury in this case. Courts have recognized "two species" of due process claims in criminal cases: (1) "State action that 'shocks the conscience' violates the Due Process Clause's substantive component," and (2) "[s]tate action that deprives a defendant of a fundamentally fair trial violates the Due Process Clause's procedural component." *Stumpf v. Robinson*, 722 F.3d 739, 748 n. 8 (6th Cir. 2013).

**1. Evidence of Pseudoephedrine Purchases Used in the Smith Conspiracy**

Collins argues that his due process rights were violated by the prosecutor's admission of evidence of pseudoephedrine transactions that "necessarily occurred in the Smith conspiracy." *Collins' Br.* at 52. Collins claims that by admitting this evidence, the government impermissibly "used the same evidence to convict different sets of defendants in two separate, rival

conspiracies in two different trials." *Id.* at 53. Although "inconsistent prosecutorial theories can, in certain circumstances, violate due process rights," the government's introduction of the challenged pseudoephedrine purchase records does not amount to reliance on "inconsistent prosecutorial theories." *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000). As was discussed above, the overlapping evidence put forward at both Defendants' trial and the Smith trial does not reflect two inconsistent criminal theories because the pseudoephedrine purchases introduced at both trials could account for enough methamphetamine to establish two separate conspiracies.

Moreover, the government in this case affirmatively solicited testimony from Agent O'Neil that some of the pseudoephedrine purchases he identified could have been traded with other dealers or cooks, including Darlene and Roscoe Smith. This testimony was expanded upon during cross-examination, and some of the witnesses whose pseudoephedrine purchases were entered into evidence testified that they traded pseudoephedrine with multiple people other than Defendants.

The district court did not plainly err by allowing the prosecution to admit evidence that may have overlapped with the Smith conspiracy because the government's introduction of this evidence did not necessarily conflict with its presentation of the evidence in the *Smith* case.

### 2. Potential Inappropriate Influence on Jurors

Citing to no relevant caselaw, Collins also argues that his due process rights were violated because the jury pool in his case was the same as the jury pool in the Smith trial. During *voir dire*, the district court suggested to counsel that the court should ask the potential jurors whether they had served on the jury in the Smith trial. The court subsequently granted the defense's motion to strike five potential jurors who had served on the Smith jury. Collins argues that although no other potential jurors remembered serving on the Smith jury, some of them "undoubtedly participated in voir[] dire in the Smith case, heard the names of witnesses from that case, and were otherwise prejudiced against Collins." *Collins' Br.* at 53. Collins fails to point to any specific information that would have been discussed at *voir dire* in the Smith trial that might have then prejudiced potential jurors against him. The district court did not plainly err by failing to *sua sponte* identify and dismiss jurors who participated in *voir dire* in the Smith trial.

**G. Admission of "Methcheck" Records as Business Records**

"In reviewing a trial court's evidentiary determinations, [we] review[] *de novo* the court's conclusions of law and review[] for clear error the court's factual determinations that underpin its legal conclusions." *Baker*, 458 F.3d at 516.   However, we have also applied an abuse of discretion standard to our review of a district court's Rule 803(6) admissibility decisions. *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986) ("[O]n review, we will reverse the district court's decision only if we find a clear abuse of discretion.").   We need not resolve this discrepancy since Defendants' challenge fails under either standard of review.

Rule 803(6) of the Federal Rules of Evidence permits records of regularly conducted business activity to be admitted into evidence if the records meet four requirements: 1) they were "created in the course of a regularly conducted business activity," 2) they were "kept in the regular course of that business," 3) they resulted from a "regular practice of the business" to create such documents, and 4) they were "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071-72 (6th Cir. 2014); Fed. R. Evid. 803(6).   The fulfilment of these conditions must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D).

Brosky argues that the government did not lay the requisite foundation to introduce the pseudoephedrine purchase records created by MethCheck under Rule 803(6) because the officers who first discussed the particular MethCheck records at issue in this case were not "qualified witnesses." *Brosky's Br.* at 21.   On the other hand, the government contends that the records were properly introduced because, consistent with Rule 803(6), "prior to the testimony of [the officers], the custodian of records (Acquisto) provided the general foundational testimony of 'the custodian or another qualified witness.'" *Appellee's Br.* at 79 (quoting Fed. R. Evid. 803(6)(D)). We conclude that the district court neither erred nor abused its discretion by admitting pseudoephedrine purchase records as business records under Federal Rule of Evidence 803(6).

MethCheck is a service provided by the NPLEx Project, which is run by Appriss, Inc., a public safety technology company.   MethCheck electronically tracks the purchase of precursors

for methamphetamine, including Sudafed and other over-the-counter medications, in real time. The government's first witness was James Acquisto, the vice president of government affairs for Appriss. Acquisto testified that Appriss keeps records containing MethCheck entries and that he is the custodian of records for these entries. Acquisto testified at length regarding the process by which MethCheck records are created and stored. In sum, Acquisto explained that when a person goes to a drug store and attempts to purchase a medication that is identified as a methamphetamine precursor, federal and state law require the individual to present the pharmacy employee with government-issued photo identification. The information is then scanned or manually entered into the MethCheck System immediately, and the clerk receives a nearly instantaneous message confirming whether the sale is legal or illegal (based on purchase quantity regulations). This purchase information becomes available to law enforcement in under a minute. Acquisto testified that the entries are automated approximately 75 percent of the time, but that the entries are entered manually in some small independent drug stores. Acquisto further testified that law enforcement officers in Kentucky may apply for access to MethCheck records from the Office of Drug Control Policy. If they are granted access, they receive a secure password and user ID to access the portal through the internet.

Despite obtaining detailed information from Acquisto regarding how MethCheck records are kept, the government did not seek to introduce specific MethCheck records through Acquisto. Instead, the government sought to introduce MethCheck records for specific purchasers through two officers, Detective Farris and Agent O'Neil. These officers testified that they accessed the MethCheck database and retrieved the records for people they suspected of being associated with methamphetamine manufacturing.

When the government sought to introduce specific MethCheck records through the officers, counsel for Brosky objected that the records were not admissible because they had not been authenticated by Acquisto, the custodian of the records. The district court overruled Brosky's objection, concluding that the testimony of the officers, in conjunction with Acquisto's detailed testimony regarding the record keeping process, was sufficient to authenticate the records.

As has already been stated, the foundation for Rule 803(6) evidence must be "shown by the testimony of the custodian or another qualified witness . . . ." Fed. R. Evid. 803(6)(D).  We have previously held that the meaning of "[another] qualified witness should be given the broadest interpretation." *Hathaway*, 798 F.2d at 906 (internal quotation marks omitted).  The foundation for admitting evidence under Rule 803(6) "may be laid, in whole *or in part*, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted.  The only requirement is that the witness be familiar with the record keeping system." *United States v. Laster*, 258 F.3d 525, 529 (6th Cir. 2001) (internal quotation marks and citations omitted) (emphasis added).  The qualifying witness does not need to have any personal knowledge of the records' preparation. *Baker*, 458 F.3d at 518.

The government concedes that it never sought to authenticate the MethCheck records through Acquisto alone.  Moreover, although both officers testified regarding the process by which they were able to access and retrieve data from the MethCheck system, neither officer provided information regarding the manner in which MethCheck records are kept on the backend.  Nonetheless, under our existing precedent, evidence is admissible under Rule 803(6) where, as here, foundation is provided in part by the record custodian and in part by an officer who is familiar with the system and can testify to the process by which information is retrieved.  Accordingly, the district court neither erred nor abused its discretion in determining that the foundation provided was adequate to introduce the MethCheck records under Rule 803(6).

**H.  Confrontation Clause Challenge to Admission of MethCheck Records**

**Preservation of the Issue and Standard of Review**

On appeal, Defendants raise Confrontation Clause challenges to the admission of the MethCheck records.  The government contends that none of the Defendants preserved this issue for appeal because they did not raise a specific Confrontation Clause objection at trial.  Defendants argue that, "[w]hile the term 'Confrontation Clause' was not used," Collins' counsel launched a lengthy objection to the admission of the MethCheck records, repeatedly raising the fact that no one was present at trial to testify to the transactions and that the records had not been disclosed in a timely manner. *Collins' Reply Br.* at 18-19; *Brosky's Reply Br.* at 4.  Although lengthy, Defendants' objection was focused exclusively on the authentication of the records and

the lack of relevancy to the alleged conspiracy. (*See, e.g.*, R. 697, Transcript of Day 5 of Jury Trial, Page ID # 6772-73 ("[I]t would be our position that [the records] cannot be authenticated. They are not relevant to this trial because those persons did not come here to testify that they had taken those actions with these particular defendants.").) At trial, Defendants did not raise any concerns regarding the violation of their constitutional right to confront the witnesses against them. Accordingly, Defendants failed to preserve their Confrontation Clause claim adequately for appellate review.

Because Defendants failed to preserve this issue for review, we review their Confrontation Clause claims for plain error. "Plain error review applies even if the forfeited assignment of error is a constitutional error." *Cromer*, 389 F.3d at 672; *see United States v. Hadley,* 431 F.3d 484, 498 (6th Cir. 2005) (reviewing a Confrontation Clause claim for plain error because "Defendant raised only a hearsay objection to [the contested] statements at trial, and did not challenge their admissibility on constitutional grounds").

**Analysis**

The district court did not commit plain error in violation of the Confrontation Clause by allowing the government to introduce the pseudoephedrine purchase records. The Confrontation Clause of the Sixth Amendment "guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'" *Johnson*, 581 F.3d at 324 (quoting U.S. Const. amend. VI). To that end, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53-54 (2004). "Hearsay evidence that is non-testimonial is not subject to Confrontation Clause analysis . . . ." *United States v. Parlier*, 570 F. App'x 509, 517 (6th Cir. 2014). For a statement to be considered "testimonial" under the Confrontation Clause, the declarant must have "intend[ed] to bear testimony against the accused." *Cromer,* 389 F.3d at 675. This determination "depends on whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Johnson*, 581 F.3d at 325 (internal quotation marks omitted).

## 1. Nature of the MethCheck Records

As has been previously described, information is entered into the MethCheck system by pharmacy employees whenever a customer attempts to purchase products containing pseudoephedrine. Acquisto testified that, 75 percent of the time, these entries are made automatically through the scanning or swiping of the customer's identification card. The rest of the time, the pharmacy employee must manually enter the customer's information into the system. Collins and Wilburn argue that "[t]he data inputted from the store clerk is essentially a testimonial declaration that 'this person appeared in front of me on a given date and purchased a given quantity of pseudoephedrine.'" *Collins' Br*. at 56. In making this argument, Collins and Wilburn analogize this case to the Supreme Court's decisions in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011).

In *Melendez-Diaz,* the Supreme Court held that the admission of affidavits from forensic analysts who had performed drug analysis on evidence seized from a suspect but did not themselves testify violated the Confrontation Clause. 557 U.S. at 329. Relying heavily on this decision, the Court in *Bullcoming* held that the Confrontation Clause barred the admission of a blood alcohol level test where the certifying analyst did not testify and the government instead relied on the testimony of another analyst familiar with the forensic procedures. The *Bullcoming* Court determined that the analyst's report, like the affidavit at issue in *Melendez-Diaz*, was testimonial in nature because it was made in aid of a police investigation "solely for an evidentiary purpose." *Bullcoming*, 131 S. Ct. at 2717 (internal quotation marks omitted). The report was made by a state laboratory "required by law to assist in police investigations" on the basis of evidence seized by a law enforcement officer. *Id*. According to Collins, the "store clerks who inputted the data are analogous to the analyst who certified the forensic test in *Bullcoming*." *Collins' Br*. at 57.

To the contrary, unlike the forensic report at issue in *Bullcoming* and the affidavit at issue in *Melendez-Diaz*, the MethCheck reports at issue in this case were not made to prove the guilt or innocence of any particular individual, nor were they created for solely evidentiary purposes. Although law enforcement officers may use MethCheck records to track pseudoephedrine purchases, the MethCheck system is designed to prevent customers from purchasing illegal

quantities of pseudoephedrine by indicating to the pharmacy employee whether the customer has exceeded federal or state purchasing restrictions. *See United States v. Towns*, 718 F.3d 404, 411 (5th Cir. 2013) ("Because the [pseudoephedrine] purchase logs were not prepared specifically and solely for use at trial, they are not testimonial and do not violate the Confrontation Clause."). Furthermore, it is improbable that a pharmacy employee running a standard identification check of a customer would have anticipated that the records of that transaction would later be used against these particular defendants at trial. Because the MethCheck records at issue in this case are not clearly testimonial in nature, the district court did not commit plain error in violation of the Confrontation Clause by allowing their admission at trial.

### 2. Brosky's Right to Cross-Examine Government Witnesses

Brosky argues that his right to cross-examine government witnesses effectively, as guaranteed by the Confrontation Clause, was violated by the government's late disclosure of certain MethCheck records that were introduced as evidence towards the end of trial. Specifically, Brosky notes that MethCheck records attributed to government witnesses who had already been excused were brought to the Defendants' attention only before the last day of the government's case-in-chief, when they were entered into evidence. As a result, Defendants were unable to cross-examine the relevant government witnesses in order to ascertain how much of the pseudoephedrine they purchased was associated with the alleged conspiracy.

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 19-20 (1985) (emphasis and internal quotation marks omitted). "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 20 (emphasis omitted). In this case, Brosky availed himself of the opportunity to cross-examine the government's witnesses fully. To the extent that the witnesses testified that they had given Brosky boxes of Sudafed in return for methamphetamine, Brosky had an opportunity to question the witnesses about the amount of Sudafed traded even without referencing the MethCheck records. Additionally, Brosky had the opportunity to cross-examine Agent O'Neil about the MethCheck records when they were introduced. Brosky has not demonstrated that the district court

committed plain error in violation of the Confrontation Clause by allowing the government to utilize the additional MethCheck records on the last day of their case-in-chief.

## I. Prosecutorial Misconduct

We "review claims of prosecutorial misconduct that were objected to in the trial court de novo." *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011); *United States v. Henry,* 545 F.3d 367, 376 (6th Cir. 2008) ("Allegations of prosecutorial misconduct contain mixed questions of law and fact that we usually review de novo.").

Collins has failed to establish that the prosecutor committed misconduct by knowingly eliciting false testimony from Joseph Ore, a government witness. The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). "This rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony." *Workman v. Bell*, 178 F.3d 759, 766 (6th Cir. 1998). This Court has "fashioned a three-part test for determining whether there was a denial of due process through the use of false testimony." *Peoples v. Lafler*, 734 F.3d 503, 515 (6th Cir. 2013). The defendant must establish that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.* at 516. A false statement is material "if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010).

At trial, Joseph Ore testified that he transacted with Collins daily, trading Sudafed for methamphetamine, from January 2009 until Ore went to prison in July 2009. However, this testimony was necessarily false, as Collins was incarcerated on unrelated charges during this entire time period. Throughout his testimony, Ore seemed to be somewhat confused about the specific dates at issue. For example, when asked by the prosecutor about the timing of the alleged drug transactions, Ore offered, "I can't remember specific dates, but somewhere in that time frame." (R. 700, Transcript of Day 3 of Jury Trial, Page ID # 7800-7801.) Collins' attorney objected to this testimony on the ground that it is undisputed that Collins was incarcerated for all of 2009 and was only released from prison in January 2010. When questioned by the district court, the Assistant United States Attorney indicated that he did not

know "specifically when Mr. Collins was in custody" but that he thought that Collins "got out [in] April of 2009." (*Id.* at 7805.)  The district court concluded that "the record is [not] sufficient to suggest that the testimony and the responses that are going to be elicited are knowingly false[,]" and overruled Collins' objection. (*Id.* at 7806.)  On cross-examination, Collins' attorney elicited Ore's admission that he had no dealings with Collins while either Collins or Ore were incarcerated.  Collins argues that the prosecutor either knew or should have known when Collins was in jail, and thus either knew or should have known that Ore was testifying falsely when he stated that he had traded with Collins in 2009.

The prosecutor's communication with the district judge suggests that he was confused about the dates of Collins' incarceration—and therefore did not know he was eliciting false testimony from Ore.   Regardless of this confusion, the prosecutor undoubtedly should have known that Collins was incarcerated until January 2010, given that Collins was on trial for a conspiracy that allegedly began in 2009.  *See Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007) (stating in dicta that the knowledge requirement is fulfilled if the "prosecution knew or *should have known* that [a witness] was committing perjury" (emphasis added)).  Even so, Collins fails to satisfy the materiality prong of the requisite analysis.  While Ore's false statement may have been material if left uncorrected, shortly after providing his false testimony, Ore was cross-examined effectively by Collins' counsel, who clearly refuted Ore's previous assertion.  During the cross-examination, Ore admitted that he was not sure about the dates and would not be surprised to hear that Collins had been in jail for all of 2009.  He also conceded that he had no dealings with Collins while Collins was incarcerated, and the jury was made aware of Collins' dates of incarceration.  Given that Ore's testimony was wholly unbelievable in light of Collins' dates of incarceration, there is no reasonable likelihood that the jury believed Ore's incorrect statements.  Therefore, while the prosecutor's conduct was highly troublesome, it did not amount to a denial of due process.

**J.  Testimony that Collins and Wilburn Traded Methamphetamine for Sex**

**Preservation of the Issue and Standard of Review**

Wilburn concedes that counsel did not object to the challenged testimony during trial. Where a defendant forfeits his objection to testimony at trial, the reviewing court considers the

admission of that testimony for reversible plain error. *United States v. Willoughby*, 742 F.3d 229, 236 (6th Cir. 2014). To establish that the admission of contested testimony amounted to plain error, a defendant must show that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, [meaning that] it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks omitted). Where a defendant has failed to object to the disputed testimony at trial, our "review is doubly deferential," and "we must determine, in essence, that the district court obviously abused its discretion when it admitted the [challenged] testimony." *Willoughby*, 742 F.3d at 238.

**Analysis**

The district court did not plainly err by admitting evidence that Wilburn and Collins traded methamphetamine for sex. Under Rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We have consistently held that "[a] district court has very broad discretion in making this determination." *Semrau*, 693 F.3d at 523 (internal quotation marks omitted). A district court must "weigh the proper probative value of the evidence against . . . its unfairly prejudicial effect." *United States v. Parkes*, 668 F.3d 295, 305 (6th Cir. 2012). "Evidence that lacks inflammatory detail . . . might not be unfairly prejudicial at all." *Sims*, 708 F.3d at 836.

Wilburn argues that the government introduced "significant prejudicial evidence" relating to Wilburn and Collins trading methamphetamine for sex. *Wilburn's Br.* at 16. This testimony, Wilburn contends, "caused the jury to have disdain for Wilburn unrelated to the offenses of conviction" and should have been excluded by the district court. *Id.* Although it lacked inflammatory detail, this testimony was likely prejudicial and harmful to the defendants. However, it also had substantial probative value as it helped to establish the government's conspiracy-to-distribute theory. The district court did not commit "clear or obvious" error by allowing this testimony to be admitted.

## III.  Sufficiency Issues

We review a challenge to the sufficiency of the evidence supporting a criminal conviction *de novo*.  *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014).  A defendant challenging the sufficiency of the evidence "bears a very heavy burden."  *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005).  In evaluating such a challenge, we are tasked with determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  When engaging in this analysis, we "neither independently weigh[] the evidence, nor judge[] the credibility of witnesses who testified at trial."  *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010).  Any "issues of credibility" must be resolved in favor of the jury's verdict.  *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001).

### A.  Sufficiency of Evidence Related to Wilburn's Participation in the Conspiracy

The government presented sufficient evidence to allow a rational trier of fact to conclude that Wilburn entered into a conspiracy to manufacture and distribute methamphetamine. The elements that the government needed to prove in order to convict Wilburn under 21 U.S.C. § 846 are: "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy."  *Pritchett,* 749 F.3d at 431 (internal quotation marks omitted).  "[T]he government need not prove the existence of a formal or express agreement among the conspirators.  Even a tacit or mutual understanding among the conspirators is sufficient."  *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (citations omitted).  A defendant's knowledge and intent to join the conspiracy "can be inferred through circumstantial evidence . . .  including evidence of repeated purchases, or evidence of a large quantity of drugs." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006).

Wilburn argues that the government failed to prove that an ongoing agreement existed, or that Wilburn had knowledge of such an agreement and purposefully joined it.  To the contrary, the government presented significant witness testimony suggesting that Wilburn had an agreement with Brosky and Collins to manufacture methamphetamine.  For example, Hollie Adkins testified that Wilburn joined Collins and Brosky in a "three-way split on a cook" of

methamphetamine.  (R. 699, Transcript of Day 2 of Jury Trial, Page ID # 7577.)  She testified that she had seen Wilburn, Collins and Brosky cook methamphetamine together: "I was there.  I [saw] them get the stuff together.  I [saw] them bring it back and finish smoking it off.  I [saw] them weigh it out, sell it." (*Id.* at 7563.)  Additionally, Charles Skaggs testified that Wilburn and Collins would give him methamphetamine in exchange for lithium batteries, which are used to manufacture methamphetamine.  Likewise, Mickey Brown testified that he helped Wilburn and Collins cook methamphetamine on the mountain close to Wilburn and Collins' trailers 20 to 30 times.  Such testimony was sufficient to allow a rational trier of fact to conclude that all three elements of conspiracy had been met.

Resolving all credibility issues in favor of the jury's verdict, the government presented sufficient evidence to allow a rational trier of fact to conclude that Wilburn entered into a conspiracy to manufacture and distribute methamphetamine.

**B.  Sufficiency of Evidence Supporting Drug Amounts**

Collins and Wilburn argue that the evidence presented at trial was insufficient to prove that they conspired to manufacture or distribute *500 grams or more* of methamphetamine.  The basis of this sufficiency challenge is the amount of methamphetamine rather than the existence of the conspiracy itself.  In *Alleyne v. United States*, the Supreme Court held that "facts that increase mandatory minimum sentences must be submitted to the jury."  133 S. Ct. 2151, 2163 (2013).  Under 21 U.S.C. § 841(b), if a conspiracy involves 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a mandatory minimum is triggered.  Therefore, this amount is an element of the offense that must be submitted to the jury and proven beyond a reasonable doubt.

In *United States v. Dietz*, we held that a "reasonable jury could infer" the threshold drug quantity in a drug conspiracy case from witnesses' testimony.  577 F.3d 672, 681 (6th Cir. 2009).  In so finding, we noted that the defendant's sufficiency challenge regarding drug quantities effectively asked us "to substitute our own evaluation for the jury's conclusion about the weight of the evidence and witness credibility, which we may not do." *Id.* at 682.  The same concern is raised by Defendants' argument.  In the instant case, the government introduced the testimony of Mickey Brown, who testified that over the course of seven (non-consecutive) months, he was

present for 20 to 30 instances in which Collins and Wilburn cooked 16 to 34 grams of methamphetamine.  This testimony alone could account for up to 1,020 grams of methamphetamine.  While Brown's credibility was called into question by defense counsel, it is not the place of this Court to substitute its credibility assessment for that of the jury.

Under the relevant standard of review, which places a "very heavy burden" on defendants, Collins and Wilburn have failed to demonstrate that it would be impossible for "*any rational trier of fact*" to find that Collins and Wilburn conspired to manufacture and distribute 500 grams or more of methamphetamine.  *Jackson*, 443 U.S. at 319.  Such a finding is possible on the basis of Brown's testimony alone, as well as in conjunction with numerous other witnesses who testified to observing the Defendants engaging in distribution and manufacturing activities and the previously discussed pseudoephedrine purchase records.  Accordingly, the government presented sufficient evidence to support the jury's findings that Collins and Wilburn conspired to manufacture and to distribute more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine.

## IV.  Sentencing Issues

### A.  Prosecutorial Misconduct at Collins' Sentencing

**Preservation of the Issue and Standard of Review**

Collins did not object to statements made by the prosecutor at the time of sentencing and has failed to preserve this issue for appellate review.  "We usually review claims of prosecutorial misconduct *de novo*," but where "the defendant did not raise the misconduct claim below, we review the record only for plain error."  *United States v. Coker*, 514 F.3d 562, 568 (6th Cir. 2008).  To establish that plain error has occurred, the defendant must prove that: "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected the defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001).

**Analysis**

Collins argues that his Sixth Amendment rights were violated when, during his sentencing hearing, the prosecutor quoted a statement made to Collins by his defense counsel in a previous case in state court. *Collins' Br.* at 66. Although we are troubled by the prosecutor's behavior, we find Collins' argument unpersuasive.

The Sixth Amendment guarantees defendants access to a fair adversarial criminal process. *United States v. Cronic*, 466 U.S. 648, 656 (1984). "Where the Sixth Amendment is violated, a serious risk of injustice infects the trial itself." *Chittick v. Lafler*, 514 F. App'x 614, 617 (6th Cir. 2013) (internal quotation marks omitted). "[I]n order to establish a violation of the Sixth Amendment right to counsel ensuing from government surveillance, a claimant must not only show that conversations with an attorney were surreptitiously monitored, but must also show that the information gained was used to prejudice the claimant's defense in his criminal trial." *Sinclair v. Schriber*, 916 F.2d 1109, 1112 (6th Cir. 1990). The Supreme Court and the Sixth Circuit have identified a number of factors to consider in determining whether a defendant's Sixth Amendment rights have been violated by an "invasion of the attorney-client privilege," including:

> 1) whether the presence of [an] informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of [an] informant was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; 3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government.

*United States v. Steele*, 727 F.2d 580, 585 (6th Cir. 1984) (citing *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977)).

Collins' challenge is based on a statement made by the prosecutor in arguing for a sentence at the upper end of the Guidelines range or an upward departure. The prosecutor stated:

> It is open knowledge within the Knox County Bar Association in regards to the facts laid out in Paragraph 7 as to what happened afterwards. The public defender in that case specifically told Mr. Collins this was his last chance. He told him, "Look, the federal authorities are now looking at you. You need to clean up." He

chose not to do so.  He chose to proceed full blast.  And based on that, there is no confidence he will not commit another crime as soon as he is outside the control of any federal judicial officer, Your Honor.

(R. 678, Sentencing Transcript, Page ID # 3078.)  In his appellate brief, Collins suggests that the prosecution must have learned about this comment through surveillance.  The government asserts that the comment quoted by the prosecutor may have been made by Collins' previous counsel "in open court, or elsewhere within the earshot of the public." *Appellee's Br.* at 102. Collins puts forward no evidence to suggest that the government engaged in impermissible surveillance of his interactions with his attorney, but argues that it is an "unlikely scenario" that defense counsel would have made this statement in open court. *Collins' Reply Br.* at 25.

Collins further argues that the statement "greatly prejudiced" him at sentencing because it informed the district court's choice of sentence. *Collins' Br.* at 67.  In imposing its sentence, the court referenced the statement at issue, attributing it to state or local authorities:

But I'm very concerned about needing to promote respect for the law and deter future conduct here because whatever I see happening in your past, whatever we've done in the past, hasn't worked.  And as with respect to promoting respect of the law, whatever we've done in the past hasn't worked.  It's this representation anecdotally I understand the state authorities and the local authorities are saying, "Mr. Collins, you got a last chance here, you know.  You got to clean this up.  You got to put it behind you.  You got to do something else."

(R. 678, Sentencing Transcript, Page ID # 3089-90.)

Regardless of the source of the disputed statement, it was inadvisable and unprofessional for the prosecutor to rely on gossip about an attorney's conversation with his client at sentencing. Nonetheless, we need not decide whether the prosecutor's conduct rose to the level of misconduct because, notwithstanding the propriety of the government's behavior, Collins has not demonstrated that he was prejudiced by the prosecutor's use of his previous attorney's statement. During the sentencing hearing, the government emphasized Collins' lengthy criminal history (eleven felonies and multiple misdemeanor convictions.)  The government also called the district court's attention to Collins' failure to comply with previous court orders and his numerous failures to comply with the terms of his state probation.  The challenged anecdote may have

further emphasized Collins' criminal history and lack of respect for the law, but it contained no additional information about Collins' history or behavior that was not already before the court.

Collins has failed to demonstrate that the prosecutor "surreptitiously monitored" his interactions with his attorney or that Collins was prejudiced by the introduction of potentially privileged statements during his sentencing hearing. He therefore cannot establish that his Sixth Amendment rights were violated by the prosecutor's behavior.

**B. Procedural Reasonableness of Collins' Sentence**

We review a district court's sentence for reasonableness under an abuse of discretion standard. *United States v. Mitchell*, 681 F.3d 867, 879 (6th Cir. 2012). When reviewing a sentence for procedural reasonableness, we "must determine whether the district court: '(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range.'" *United States v. Lumbard*, 706 F.3d 716, 725 (6th Cir. 2013) (quoting *United States v. Young*, 553 F.3d 1035, 1054 (6th Cir. 2009)). We review a district court's findings of fact for clear error, *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012), whereas "[q]uestions involving the interpretation of the guidelines are legal questions that [we] review *de novo.*" *United States v. Murphy*, 241 F.3d 447, 458 (6th Cir. 2001). "[T]he determination of whether specific facts actually constitute an obstruction of justice is a mixed question of fact and law that we review *de novo.*" *Bazazpour*, 690 F.3d at 805.

Furthermore, whether Collins committed perjury is a question of fact to be reviewed for clear error. *See United States v. Canestraro*, 282 F.3d 427, 431 (6th Cir. 2002) ("This Court reviews the district court's findings of fact at sentencing for clear error."); *United States v. Lane*, 14 F.3d 603 at *1 (6th Cir. 1993) (unpublished table disposition) ("Whether a defendant committed perjury is a question of fact to be determined by the district court and will be reviewed on appeal for clear error with due regard for the district court's opportunity to make credibility determinations.").

Collins argues that his sentence was procedurally unreasonable because the district court miscalculated his Guidelines range by improperly applying a two-level adjustment to his offense level for obstruction of justice under U.S.S.G. § 3C1.1. He also contends that his sentence was procedurally unreasonable because it was based on a clearly erroneous finding that the conspiracy involved more than 500 grams of methamphetamine. We disagree.

### 1. Obstruction of Justice Enhancement

The district court imposed a two-level increase to Collins' offense level for obstruction of justice under U.S.S.G. § 3C1.1 on the ground that Collins obstructed justice by providing false testimony under oath regarding the purpose of a trip that Collins took to Seymour, Indiana. In particular, the district court found that Collins' testimony that he "didn't go to Indiana and bring any anhydrous ammonia back," was "contrary to what the evidence ended up showing, which was that that trip was [for] the purpose of stealing and acquiring anhydrous ammonia." (R. 678, Collins Sentencing Transcript, Page ID # 3063, 3070-71.)

> Section 3C1.1 of the United States Sentencing Guidelines provides:
>
> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The comments to § 3C1.1 note that "committing, suborning, or attempting to suborn perjury" is an "example[] of the type[] of conduct to which this enhancement applies." *Id.* at § 3C1.1 cmt. 4(B). Perjury is defined as "(1) a false statement under oath (2) concerning a material matter (3) with the willful intent to provide false testimony." *United States v. Watkins,* 691 F.3d 841, 851 (6th Cir. 2012). In a recent opinion, we cautioned that, if this sentencing enhancement applied to every defendant who testified and then was convicted, "a defendant's constitutional right to testify on his own behalf could be undermined by the prospect that he would be punished at sentencing for doing so." *United States v. Kamper*, 748 F.3d 728, 747 (6th Cir.), *cert. denied*, 135 S. Ct. 882 (2014). In light of this concern, "the obstruction-of-justice enhancement applies only if the district court '(1) identif[ies] those particular portions of

defendant's testimony that it considers to be perjurious; and (2) either make[s] a specific finding for each element of perjury or, at least, make[s] a finding that encompasses all of the factual predicates for a finding of perjury.'" *Id.* (quoting *United States v. Lawrence,* 308 F.3d 623, 632 (6th Cir. 2002)).

The district court made these obligatory findings. First, as stated above, the district court specifically identified Collins' testimony about the purpose of his trip to Indiana as the relevant perjurious testimony. Second, the district court explicitly addressed each element of perjury. Referring to the testimony about Collins' trip to Indiana, the district judge stated, "I think that the record with regard to that specific part of the testimony was certainly willful. It was material to the matter which deals with the manufacture of methamphetamine. It's false testimony under oath, and I think that[] fits the elements of perjury." (R. 678, Collins Sentencing Transcript, Page ID # 3071.)

Collins argues that the district court's finding of obstruction of justice was clearly erroneous because the jury acquitted him of Count 6, Possession of Stolen Anhydrous Ammonia Transported across State Lines. In *United States v. Zajac*, we "consider[ed] the proper standard of proof to be applied by a sentencing judge in determining whether a defendant has committed perjury and is thus subject to an enhanced sentence for obstruction of justice." 62 F.3d 145, 146 (6th Cir. 1995). We held that "a preponderance of the evidence standard continues to be the correct standard for all fact-finding at sentencing." *Id.* at 150. In acquitting Collins of Count 6, the jury applied the higher "beyond a reasonable doubt" standard. Consequently, Collins' acquittal does not establish that the district court was clearly erroneous in finding that a preponderance of the evidence supported its finding of perjury. Moreover, the district court's finding was supported by the record. In particular, Mickey Brown testified that he and Collins went to Indiana "[t]o steal anhydrous ammonia" in order to "make methamphetamine." (R. 699, Transcript of Day 2 of Jury Trial, Page ID # 6027). Accordingly, the district court did not commit clear error in finding that Collins perjured himself by testifying that he did not travel to Indiana to acquire anhydrous ammonia, nor did the court err in applying the obstruction of justice enhancement to Collins.

**2. Clearly Erroneous Facts**

Collins further argues that "no rational jury" could have determined that "the conspiracy manufactured or distributed more than 500 grams of methamphetamine where [1] the cooks were in jail for the first half of the conspiracy, [2] the conversion ratio was problematic, and [3] pseudoephedrine from another conspiracy was attributed to Collins." *Collins' Br.* at 70-71. Collins concludes that his sentence was therefore procedurally unreasonable because he was "sentenced based on clearly erroneous facts." *Id.* at 71. This argument is effectively a reprise of Collins' other unsuccessful arguments.

"The district court's determination of the quantity of drugs for which a defendant is held responsible is a factual finding that we review for clear error." *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). "A factual finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) (internal quotation marks omitted). As has been discussed above, the jury found Collins responsible for conspiring to manufacture or distribute at least 500 grams of methamphetamine after hearing evidence that included: (1) the typical conversion ratio from pseudoephedrine to methamphetamine, (2) the pseudoephedrine purchase records of individuals associated with the conspiracy, and (3) the testimony of multiple witnesses who observed Collins manufacturing and distributing methamphetamine after his release from incarceration. Collins has failed to demonstrate that, given the evidence presented at trial, the jury's finding of drug quantity and the sentence imposed by the district court were based on clearly erroneous facts.

**C. Substantive Reasonableness of Collins' Sentence**

We "review a district court's sentencing determination for reasonableness under a deferential abuse of discretion standard." *United States v. Cochrane*, 702 F.3d 334, 343 (6th Cir. 2012). Review for substantive reasonableness "'requires inquiry into . . . the length of the sentence and the factors evaluated . . . by the district court in reaching its sentencing determination.'" *Id.* at 344 (quoting *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009)). Our analysis is guided by the statutory requirement that "[t]he court shall impose a

sentence sufficient, but not greater than necessary," to accomplish the sentencing purposes set forth by Congress.  18 U.S.C. § 3553(a).

"A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).  Our substantive-reasonableness review "'take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range.'" *Cochrane*, 702 F.3d at 345 (quoting *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007)).  "The sentencing judge may not presume that the guidelines range is reasonable, but must consider all of the relevant § 3553(a) factors . . . ." *Conatser*, 514 F.3d at 520.  Where the district court selects a properly calculated within-guidelines sentence, the sentence "will be afforded a rebuttable presumption of reasonableness on appeal." *Id.*

Collins fails to show that his sentence was substantively unreasonable.  Collins challenges the substantive reasonableness of his sentence on two grounds:  first, he asserts that his sentence is substantively unreasonable because it was based on "the attorney-client privileged communications between Collins and his public defender in state court" and, second, he claims that his sentence of 324 months of imprisonment "is substantially greater than necessary to accomplish the sentencing goals." *Collins' Br.* at 72-73.

### 1.  Statement Made by Collins' Former Attorney

As was already discussed, Collins has not shown that the statement made by his former attorney and repeated by the prosecutor at sentencing (that "this was his last chance") was protected by attorney-client privilege. (R. 678, Collins Sentencing Transcript, Page ID # 3078.) In addition, Collins has failed to demonstrate that the district court based its sentence on this statement.  Rather, the district court appears to have based its concern about Collins' lack of respect for the law on Collins' lengthy criminal history as well as his history of violating court orders and the terms of his probation.  At sentencing, the district judge explained, "I'm very concerned about needing to promote respect for the law and deter future conduct here because whatever I see happening in your past, whatever we've done in the past, hasn't worked."  (R. 678, Collins Sentencing Transcript, Page ID # 3089-90.)  The district court further explained,

"[W]e are shaking our heads when we find a defendant who's had so many times in which we've tried to impose a sentence to have you change your direction, and you don't." (*Id.* at 3087-88.) The court merely referred to the statement allegedly made by Collins' public defender as anecdotal in nature, and ultimately based its sentence on an appropriate consideration of the § 3553(a) factors.

### 2. Duration of Collins' Incarceration

Collins' 324-month sentence is within his Guidelines range and therefore should be "afforded a rebuttable presumption of reasonableness on appeal." *Conatser*, 514 F.3d at 520. Collins has offered no rebuttal to this presumption. The district court engaged in a lengthy discussion of the sentencing factors set forth in § 3553(a) in determining Collins' sentence. *See* 18 U.S.C. § 3553(a)(2) (listing the purposes of sentencing as the need for a defendant's sentence—"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). In particular, the district court discussed: the seriousness of Collins' offense given the devastation caused by methamphetamine; Collins' lack of respect for the law; the need "to protect the public from [Collins'] crimes;" the need for "just punishment" given the "people hurt" and "lives destroyed" by this "serious crime;" and Collins' extensive criminal history. (R. 678, Collins' Sentencing Transcript, 3086-96.). The district court explicitly found that "the following sentence is sufficient, but not greater than necessary, to comply with the purposes of 18 United States Code, Section 3553(a)." (*Id.* at 3095-96.)

Collins' sentence was substantively reasonable. The district court did not base its sentence on an impermissible factor; rather, the district court based its sentence on the relevant 3553(a) factors and imposed a sentence that was sufficient, but not greater than necessary, to accomplish the sentencing goals.

**D.  Wilburn's Career Offender Status**

Wilburn was sentenced as a Career Offender within the meaning of U.S.S.G § 4B1.1 and now argues that the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015) invalidates this designation because one of his predicate offenses qualified under the now invalidated residual clause.  In *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's residual clause as violating defendants' constitutional right to due process, and the Court has since vacated the sentences of individuals who were sentenced under the U.S.S.G.'s identical residual clause, U.S.S.G § 4B1.2(a)(2).  *See United States v. Darden*, 605 F. App'x 545, 546 (6th Cir. 2015).

At issue is whether Wilburn's 2007 conviction for second degree assault under Kentucky Revised Statutes § 508.020 qualifies as a "crime of violence" for the purposes of determining his Career Offender status.  Following *Johnson*, a criminal conviction qualifies as a "crime of violence" if it is a federal or state offense that is "punishable by imprisonment for a term exceeding one year" and "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, [or] involves use of explosives."  § 4B1.2(a)(1), (2).  A person is guilty of second degree assault under Kentucky law if:

> (a) He intentionally causes serious physical injury to another person; or
>
> (b) He intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument; or
>
> (c) He wantonly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument.

Ky. Rev. Stat. Ann. § 508.020(1)(a)-(c).

We have previously held that crimes which require proof of physical injury necessarily have "'as an element the use, attempted use, or threatened use of physical force against the person of another" and thus qualify as crimes of violence under the "elements" clause of the ACCA.  *United States v. Anderson*, 695 F.3d 390, 400-01 (2012) (holding that under Ohio law aggravated assault was a violent felony under the ACCA because it required proof of "serious physical harm" or "physical harm," explaining that "it does not matter that the Ohio statute at

issue does not contain a stand-alone physical force element because proof of serious physical injury or pain under the statute necessarily requires proof of violent physical force"). Since second degree assault under Kentucky law requires proof of physical injury or serious physical injury, the same reasoning applies in the present case. Accordingly, the Supreme Court's opinion in *Johnson* does not invalidate Wilburn's sentence. Wilburn has failed to show that the district court erred in considering Wilburn's conviction of assault in the second degree as a crime of violence and in classifying Wilburn as a career offender.

**E. Substantive Reasonableness of Wilburn's Sentence**

As was stated above, we "review a district court's sentencing determination for reasonableness under a deferential abuse of discretion standard." *Cochrane*, 702 F.3d at 343. Review for substantive reasonableness "requires inquiry into . . . the length of the sentence and the factors evaluated . . . by the district court in reaching its sentencing determination." *Id.* at 344 (internal quotation marks omitted). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Conatser*, 514 F.3d at 520. "A properly calculated within-guidelines sentence will be afforded a rebuttable presumption of reasonableness on appeal." *Id.*

The district court sentenced Wilburn to 360 months' incarceration, reflecting the bottom of his Guidelines range, which was 360 months of incarceration to life. Wilburn argues that his sentence is substantively unreasonable because a shorter sentence would have adequately met the statutory purposes of sentencing.

The transcript reflects that when determining Wilburn's sentence, the district court considered the § 3553(a) sentencing factors in choosing to impose a sentence at the bottom of Wilburn's Guidelines range. The district court found that the sentence needed to "be substantial to reflect how serious this crime is . . . , to promote respect for the law, [and to] deter future conduct." (R. 687, Wilburn Sentencing Transcript, Page ID # 4623-24.) The court emphasized that a substantial sentence was necessary "[to] reflect a measure of needing to protect the public from [Wilburn's] future crimes." (*Id.* at 4624.) Furthermore, the district court justified the

sentence on the basis of Wilburn's recidivism and the need to hold Wilburn accountable for "making very bad decisions that have damaged the community over the years . . . ." (*Id.* at 4626.)  Acknowledging Wilburn's problem's with addiction, the district court noted that Wilburn was going to receive drug treatment in prison. (*Id.* at 4625.)  The court ultimately concluded that a sentence of 360 months incarceration "[wa]s sufficient, but not greater than necessary, to comply with the purposes of 18 United States Code, Section 3553(a)." (*Id.* at 4631.)  As the record indicates, the district court based its sentencing decision on a thorough analysis of the factors set forth by Congress in § 3553(a), and Wilburn has failed to demonstrate that this low-end sentence was substantively unreasonable.

## F.  Brosky's Special Conditions of Supervised Release

### Preservation of the Issue and Standard of Review

Brosky concedes that he did not object to the special conditions of supervised release imposed at sentencing and did not, therefore, preserve this issue for appeal.  Accordingly, this issue is reviewed for plain error.

Our review of a condition of supervised release includes both procedural and substantive elements.  First, procedural reasonableness requires the district court to have stated "its rationale for mandating special conditions of supervised release" in open court at the time of sentencing. *United States v. Carter*, 463 F.3d 526, 528 (6th Cir. 2006).  Next, the substantive reasonableness inquiry requires us to determine whether the condition of supervised release:

> (1) is reasonably related to specific sentencing factors, namely the nature and circumstances of the offense and the history and characteristics of the defendant, and the need to afford adequate deterrence, [and] to protect the public from further crimes of the defendant . . . ; (2) involves no greater deprivation of liberty than is reasonably necessary to achieve these goals; and (3) is consistent with any pertinent policy statements issued by the Sentencing Commission.

*United States v. Zobel*, 696 F.3d 558, 573 (6th Cir. 2012).

### Analysis

At Brosky's sentencing hearing, the district court imposed a three-year term of supervised release along with standard conditions of supervised release.  In addition, the district

court added special conditions of supervised release relating to alcohol and substance use without providing an explanation for so doing.  These conditions included a prohibition on the use of alcohol.  (*Id.*)  Brosky argues that the district court plainly erred by imposing such special conditions "without providing any justification for doing so on the record." *Brosky's Br.* at 33.

Brosky claims that the circumstances in this case are comparable to those at issue in *United States v. Inman*, 666 F.3d 1001 (6th Cir. 2012).  In *Inman*, we found that the district court had erred by failing to provide any explanation for imposing a life-time alcohol ban on a defendant who had been convicted of possession of child pornography and had no history of substance abuse.  Unlike Inman, who had no history of alcohol or drug dependence and who was convicted of a crime unrelated to controlled substances, Brosky has a history of drug abuse and was convicted of a drug-related offense.

It is true that our precedent "clearly requires a district court to state in open court at the time of sentencing its rationale for mandating special conditions of supervised release." *Inman*, 666 F.3d at 1006 (internal quotation marks omitted).  However, "[a] district court's failure to explain its reasons for imposing a special condition will be deemed harmless error . . . if such reasons are clear from the record." *Carter*, 463 F.3d at 529 n.2.  In this case, the rationale for imposing the special conditions, including a ban on alcohol for the duration of Brosky's supervised release, was obvious.  Requiring Brosky to remain sober and abstain from addictive and mind-altering substances is reasonably related to his history of drug abuse, the nature of his offense, and the goals of rehabilitation and protection of the public.  Consequently, although the district court erred by failing to explain in open court its rationale for imposing the special condition of supervised release, this error was harmless because the reasons for its imposition are clear from the record.

## V.  Collins' Cumulative Error Claim

"The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial.  In order to obtain a new trial based upon cumulative error, defendants must show that the combined effect of individually harmless errors was so prejudicial as to render their trial fundamentally unfair." *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013) (internal quotation marks and citations omitted).  "This Court has not directly addressed

the issue of how (if at all) to incorporate into a cumulative-error analysis, plain errors that do not, standing alone, necessitate reversal." *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009). The distinction between harmless and plain error is irrelevant in this case, as Collins' claim fails in any event.

Collins argues that we should "reverse [his conviction] based on cumulative error because the combined effect of multiple errors deprived [him] of a fair trial." *Collins' Br.* at 75. With respect to the claims advanced by Collins, we have identified only one harmless error and one error that did not amount to plain error. First, the district court committed harmless error by admitting evidence of Collins' previous conviction pursuant to a Rule 403 analysis; the district court should have applied the more stringent Rule 609(b) analysis. Second, Agent O'Neil's testimony that a near one-to-one conversion ratio of pseudoephedrine to methamphetamine was possible was based on impermissible hearsay. Collins did not preserve his appeal to Agent O'Neil's testimony on this ground and the admittance of his testimony did not amount to plain error. Considering both identified errors together, their combined effect is far from sufficiently prejudicial to render Collins' trial fundamentally unfair, particularly in light of the substantial evidence of Collins' guilt.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgments of the district court.