NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  16a0579n.06

Case Nos. 15-1527, 15-1528, 15-1529

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Oct 25, 2016

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| FELICAR WILLIAMS (15-1527); JAMELLA | ) | MICHIGAN |
| Al-JUMAIL (15-1528); ABDUL MALIK AL- | ) | |
| JUMAIL (15-1529), | ) | |
| | ) | |
|     Defendants-Appellants. | ) | |

_____/

Before:  MERRITT, ROGERS, and KETHLEDGE, Circuit Judges

**MERRITT, Circuit Judge.**  Felicar Williams, Jamella Al-Jumail ("Ms. Al-Jumail"), and Abdul Malik Al-Jumail ("Mr. Al-Jumail") each appeal from their jury convictions for offenses related to a complicated scheme to defraud Medicare.

The defendants on appeal ("Defendants")[1] were each found to have been involved with the management and operation of businesses that existed primarily—and in some cases, exclusively—as tools to defraud Medicare.  Following a lengthy joint trial, a jury convicted each of the Defendants of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.

_____

[1] A fourth defendant, Dr. Carey Vigor, was tried alongside Ms. Williams, Ms. Al-Jumail, and Mr. Al-Jumail in the district court.  Dr. Vigor was found not guilty on all counts and, as such, does not seek this Court's review on appeal.

Ms. Williams and Mr. Al-Jumail were also convicted of conspiracy to pay and receive health care kickbacks in violation of 18 U.S.C. § 371. Ms. Al-Jumail was also convicted of destroying records in a federal investigation in violation of 18 U.S.C. § 1519.

Ms. Williams now raises several arguments on appeal that she claims require either reversal of her conviction or resentencing. First, she argues that the United States failed to produce sufficient evidence to support her conviction and that the district court's denial of her Rule 29 and Rule 33 motions for judgment of acquittal amounts to reversible error. She also argues that the trial court erroneously admitted certain evidence in violation of the Federal Rules and her rights under the Sixth Amendment. Finally, she contends that the district court erred by failing to grant her a downward variance under the Sentencing Guidelines' "aberrant behavior" provision.

Ms. Al-Jumail also raises several issues on appeal. Like Ms. Williams, Ms. Al-Jumail seeks reversal on the basis of the sufficiency of the evidence produced against her at trial. Next, she argues that certain statements within the prosecution's closing arguments amounted to unconstitutional "burden-shifting" entitling her to a new trial. Ms. Al-Jumail also attacks her sentence because she contends that it was based upon an insufficiently individualized determination of the loss attributable to her actions. Finally, she contends that the district court's criminal restitution order violates her rights under the Sixth Amendment because it was not based upon a jury's determination of the amount of loss attributable to her specifically.

Mr. Al-Jumail's only argument on appeal is that the prejudice from being tried alongside his daughter caused by the district court's denial of his motion to sever entitles him to a new trial.

Because we find no merit in any of the Defendants' arguments on appeal, we **AFFIRM** the judgments of the district court in their entirety.

## I. Facts

This case involves a number of health care businesses which operated largely independently of one another, except for the involvement of Sachin Sharma.[2] Mr. Sharma was the architect of a scheme through which he was able to bill Medicare for services that were either worthless in quality or never provided at all. The success of Mr. Sharma's scheme depended upon fraud of the most egregious kind: He hired individuals to pose as patients. He issued staff members badges falsely indicating that they had professional credentials. He acquired Medicare patient referrals by paying illegal kickbacks and then billed Medicare for services that were never provided by using falsified patient documentation. In order to avoid detection, Sharma replicated this fraud at several independently operated business entities that are the subject of this litigation.

### A. Abdul Malik & Jamella Al-Jumail

Abdul Malik Al-Jumail and his partner, Firas Alky, purchased one of Mr. Sharma's fraudulent enterprises—ABC Home Care—in 2009. Mr. Sharma testified that he and Mr. Al-Jumail discussed the fraudulent nature of ABC's business activities at the time of purchase. Mr. Sharma further testified that he and Mr. Al-Jumail discussed various strategies to prevent Medicare from discovering ABC's fraud, that Mr. Al-Jumail followed that advice after assuming control of the company, and that Mr. Al-Jumail shared a portion the profits of the fraud with Mr. Sharma. Upon being informed of an upcoming Medicare audit, Mr. Sharma connected Mr. Al-

---

[2] Sharma entered into a plea agreement with the United States conditioned upon his agreement to testify truthfully at the Defendants' trial.

Jumail with an individual who—with the help of Mr. Al-Jumail's daughter and co-defendant, Jamella—proceeded to fabricate patient documents in order to pass the inspection.

In addition to ABC, Mr. Al-Jumail owned several more home health agencies, one of which was called Accessible Home Health. Mr. Al-Jumail placed his daughter, Ms. Al-Jumail, in charge of the day-to-day operations at Accessible. Upon Mr. Al-Jumail's request, Mr. Sharma provided Ms. Al-Jumail with a flash drive filled with template documents in order to allow Accessible to execute the same fraud upon Medicare as he had at ABC. After Accessible was approved to bill Medicare, Ms. Al-Jumail directed and oversaw an elaborate records falsification process in order to produce the documents that would form the basis of Accessible's Medicare claims. When certain Accessible staff members began discussing the appropriateness of Accessible's billing practices among themselves, Ms. Al-Jumail instructed them that they were not to discuss their concerns with anyone but herself or her father.

Mr. Al-Jumail was eventually arrested for his involvement with ABC and Accessible, among other businesses. Upon learning of her father's arrest, Ms. Al-Jumail coordinated the incineration of several binders full of patient documentation.

### B. Felicar Williams

Felicar Williams and Mr. Sharma were co-owners of Haven Adult Daycare. The Haven partnership between Ms. Williams and Mr. Sharma was the product of an introduction arranged by Mr. Al-Jumail in response to Mr. Sharma's desire to expand his portfolio of health care companies beyond home health agencies. Haven's origin story is tied inextricably with the dissolution of TGW, another adult day care facility in which Ms. Williams held an ownership interest. Indeed, TGW shut down on a Friday, and Haven opened for business on the following

Monday. Many of Haven's initial clients were passed on from TGW.[3] Haven's staff was also peppered with individuals who formerly worked for TGW. Finally, Haven's clinical and billing practices were substantially the same as those employed at TGW.

Haven provided various services to adults who required supervision or care during the day. Specifically, Haven conducted individual and group "therapy" sessions with its clients. Haven staff conducted group sessions with all of their clients on a daily basis. These sessions included anywhere from twelve to twenty individuals and were essentially freeform discussions about general interest topics—health, hygiene, current events—guided only by cursory Internet searches by the staff member assigned to lead the sessions. Haven's staff also conducted individual therapy sessions with clients on a less predictable basis.

The overwhelming majority of "psychotherapy" services provided to Haven's clients fell far short of the relevant Medicare requirements. Haven's staff often led group therapy sessions with as many as twenty participants despite the fact that Medicare reimbursement for such services is limited to groups of less than twelve patients. Patients with profound intellectual disabilities were made to sit in group sessions despite their inability to meaningfully participate.[4] Therapy sessions were almost always conducted by unsupervised, unlicensed staff members without any formal training in providing psychotherapy.

In addition to overseeing the provision of these worthless services, Ms. Williams also orchestrated and oversaw an intentionally fraudulent system of documentation and billing. Ms. Williams directed her staff to document "progress notes" for two sessions of individual therapy per client per week, even if no individual services were actually provided to a patient in a given

---

[3] In addition to the patients brought from TGW, Haven obtained Medicare-eligible clients by paying money to the owners of adult foster homes in exchange for sending their charges to Haven for the day.

[4] Out of its recognition that group therapy is not effective for beneficiaries with profound intellectual disabilities, Medicare will not reimburse providers for group therapy provided to such beneficiaries.

week. In order to conceal this fraud from Medicare, she instructed Haven staff not to date their sometimes-fabricated progress notes so that another Haven employee could ensure that the services were billed on nonconsecutive days in order to comply with the relevant Medicare regulations.

## II. Procedural Background

Following nearly two years of volleying indictments and plea negotiations, a grand jury returned a Third Superseding Indictment charging Ms. Williams, Ms. Al-Jumail, and Mr. Al-Jumail—among others—as follows: Ms. Williams and Mr. Al-Jumail were both charged with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and conspiracy to pay and receive health care kickbacks in violation of 18 U.S.C. § 371. Ms. Al-Jumail was charged with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and destroying records in a federal investigation in violation of 18 U.S.C. §§ 1519 and 2.

After a twelve-week trial, a jury found the Defendants guilty on all counts. The district court sentenced Ms. Williams to five years' confinement on both counts against her to run concurrently, two additional years of supervised release, and approximately $2 million in restitution payments. Ms. Al-Jumail received a sentence of four years' imprisonment on both counts against her to run concurrently, three years of supervised release, and approximately $500,000 in restitution payments. The district court sentenced Mr. Al-Jumail to ten years' imprisonment on the conspiracy to commit health care fraud count and three years' imprisonment on the conspiracy to pay and receive health care kickbacks count to run concurrently, one year of supervised release, and over $8 million in restitution payments.

These appeals followed.

## III. Discussion

## A. Felicar Williams

Ms. Williams raises four questions for this Court's review on appeal. For the reasons articulated below, we affirm the district court's judgment against Ms. Williams in its entirety.

### 1. Sufficiency of the Evidence Claim

First, Ms. Williams claims that the evidence presented at trial was insufficient to support the jury's guilty verdict. The defendant bears a "heavy burden" when challenging the sufficiency of the evidence supporting a jury verdict on appeal. *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998). This Court reviews properly preserved sufficiency challenges de novo, asking whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To that end, this Court draws "all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict." *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014).

Ms. Williams was convicted of conspiracy to commit health care fraud and conspiracy to pay or receive health care kickbacks and claims that both convictions were based on insufficient evidence. *See* 18 U.S.C. §§ 1347, 1349 (2012) (conspiracy to commit health care fraud); *id.* § 371 (conspiracy to pay or receive health care kickbacks). Conviction for conspiracy to commit health care fraud requires that the jury find that the defendant voluntarily made an agreement, "tacit or explicit," to knowingly defraud a health care benefit program. *United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015); *see* 18 U.S.C. § 1347 (defining health care fraud). Evidence of actual fraud against Medicare and a defendant's knowledge thereof and benefit

therefrom is sufficient proof to uphold a conviction under § 1349. *Medlock*, 792 F.3d at 711. Conviction for conspiracy to pay or receive health care kickbacks requires an agreement to offer, pay, solicit, or receive remuneration in exchange for a patient referral for services payable by a federal health care benefit program. *See* 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1)(A) & (2)(A).

Ms. Williams fails to carry her "heavy burden" with respect to both convictions. *See Maliszewski*, 161 F.3d at 1005. The evidence at trial readily supports a finding that Ms. Williams committed conspiracy to commit health care fraud. Sharma testified that he and Ms. Williams founded Haven together and that they both were aware that many of the services being provided to their clients were worthless. Several of the employees under Ms. Williams's supervision at Haven testified that she routinely directed them to fabricate records for services that were never actually provided. And if there was any question as to Ms. Williams's motivation for doing so, it is answered by the testimony indicating that Williams ensured that the records were left undated so that they could be strategically dated in order to avoid raising suspicion when Haven submitted its claims to Medicare for reimbursement. The United States also presented evidence at trial that Haven actually submitted claims for reimbursement for the fabricated services. In light of the Government's proof of a voluntary agreement between Sharma and Williams to defraud Medicare, of actual fraudulent claims submitted to Medicare, and of Ms. Williams's knowledge of and benefit therefrom, a reasonable trier of fact could have found Ms. Williams guilty of conspiracy to commit health care fraud beyond a reasonable doubt. *See Medlock*, 792 F.3d at 711 (upholding a guilty verdict under highly similar facts).

The evidence at trial also supported a finding that Ms. Williams conspired to receive health care kickbacks. Several witnesses testified that they played various roles in an

arrangement between Ms. Williams and Mr. Al-Jumail whereby Mr. Al-Jumail paid Ms. Williams for Haven's patients' billing information so that he could use those patients in his own scheme to defraud Medicare. Documentary evidence of checks issued by one of Mr. Al-Jumail's businesses to Williams and certain Haven staff members corroborated that testimony. The contemporaneous nature of the payments in question and the exchange of patient billing information would permit a rational trier of fact to conclude beyond a reasonable doubt that Ms. Williams had entered into an agreement to provide patient referrals to Mr. Al-Jumail's home health agency in exchange for cash payments.

Ms. Williams takes issue with the Government's failure to produce the individual who actually submitted claims to Medicare, but that testimony was not necessary to her conviction for conspiracy to commit health care fraud. Evidence at trial showed that Williams directed the production of billing sheets for services that were never provided, that Williams gave those sheets to Haven's biller, and that the biller returned the sheets after she submitted them to Medicare. While this evidence is not perfect proof that the fraudulent claims were actually submitted to Medicare, it is certainly sufficient to permit a reasonable jury to conclude that they were. Additionally, the fact that the offense in question is *conspiracy* to commit health care fraud—as opposed to the substantive offense of health care fraud—suggests that proof of the actual submission of false claims might not have been necessary to prove the underlying offense so long as there was sufficient proof of an agreement to defraud the government and of some overt act in furtherance that agreement. *See United States v. Edmond*, 815 F.3d 1032, 1040 (6th Cir. 2016) (outlining the basic elements of the federal conspiracy offense). Accordingly, the Government was not required to produce the biller at trial in order to convict Ms. Williams of conspiracy to commit health care fraud.

Ms. Williams also argues that her convictions were based on insufficient evidence because many of the Government's best witnesses testified as conditions of their plea agreements. To the extent that this attack is based on the witnesses' possible motivations to testify favorably to the Government, it is a dispute about their credibility. Aware of our own institutional limitations, this Court has long adhered to the rule foreclosing "arguments regarding a government witness's lack of credibility" on appeal. *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010) (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)) (internal quotation marks omitted). While it is true that the Government's case relied heavily upon the testimony of individuals whose plea agreements required them to testify, the fact of those agreements was presented to the jury and the jury chose to believe the witnesses. Accordingly, we refuse to overturn the jury's verdict under the theory that it was unduly influenced by witnesses whose plea agreements required them to testify.

For the reasons stated above, the jury's verdict was supported by sufficient evidence and we affirm the district court's denial of Ms. Williams's Rule 29 and Rule 33 motions for judgment of acquittal.

## 2. Impermissible Character Evidence Claim

In addition to her generalized attack on the sufficiency of the evidence, Ms. Williams also contends that the trial court erroneously admitted testimony that she directed the creation of false patient notes at TGW—another adult day care business that Ms. Williams co-owned until it was shut down after some of her partners were indicted for fraud. Williams moved to exclude the evidence on the grounds that there was not a sufficient factual basis for its admission and that it was offered for the purpose of proving action in accordance with character. The district court

denied her motion and admitted the evidence, reasoning that it was relevant to show "absence of mistake, intent, or . . . knowledge," and that it was "more probative than prejudicial."

Rule 404(b) requires exclusion of evidence of past bad acts when those acts are offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b)(2) permits admission of the evidence so long as it is offered for "another purpose," including to establish "knowledge," "intent," or "absence of accident." Fed. R. Evid. 404(b)(2). The standard of review that we apply to a district court's Rule 404(b) ruling is the subject of some debate in this Circuit. Some panels have held that, when reviewing the trial court's decision to admit evidence of past bad acts, this court applies a "tripartite" standard of review.[5] *See United States v. Barnes*, 822 F.3d 914, 920–21 (6th Cir. 2016). Other panels have held that the Supreme Court's decision in *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997), requires that all evidentiary rulings by the district court be reviewed only for abuse of discretion. *United States v. Allen*, 619 F.3d 518, 524 n.2 (6th Cir. 2010); *see also United States v. Clay*, 667 F.3d 689, 703 (6th Cir. 2012) (Kethledge, J., dissenting). Regardless of the applicable standard, this much is clear: the district court's threshold finding that the past bad act actually occurred is subject to reversal if it is clearly erroneous. *See Allen*, 619 F.3d at 523 (applying the abuse of discretion standard and noting that "[a] district court abuses its discretion when it relies on clearly erroneous findings of fact"). A finding of fact is "clearly erroneous" if it leaves the reviewing court with "the definite and firm conviction that a mistake has been committed." *Max Trucking, LLC v. Liberty Mut. Ins.*

---

[5] "We review for clear error the district court's factual determination that the other act occurred; we examine de novo the court's legal determination that evidence of the other act is admissible for a proper purpose; and we review for abuse of discretion the court's determination that the probative value of the evidence is not substantially outweighed by a risk of unfair prejudice." *United States v. Barnes*, 822 F.3d 914, 920–21 (6th Cir. 2016).

*Corp.*, 802 F.3d 793, 808 (6th Cir. 2015) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

On appeal, Ms. Williams's primary argument is that the district court's finding that she was involved in the fraud at TGW was not based on sufficient evidence because she was not indicted in the criminal proceedings that followed the dissolution of TGW. However, plenty of evidence indicated that Williams both knew about and participated in the earlier fraud at TGW. Specifically, one of Williams's employees at TGW testified that Williams directed her to fabricate patient records for services that were never provided in order to ensure that Medicare did not take back any funds from TGW. This evidence supports the district court's finding that Ms. Williams was involved with the fraud at TGW. We affirm the trial court's preliminary finding that Ms. Williams was involved in the fraud at TGW because it was not clearly erroneous.

Ms. Williams also suggests that the evidence of her actions at TGW was admitted for the improper purpose of showing action in accordance with bad character. However, our precedents interpreting the text of Rule 404(b) make clear that evidence of past bad acts is admissible so long as it is probative of "material issue[s] other than character," including intent, knowledge, and absence of accident. *Barnes*, 822 F.3d at 921; *see also* Fed. R. Evid. 404(b)(2). Because one of Ms. Williams's primary defenses to liability in this action is that she was simply following orders and that she did not intend to defraud Medicare through her actions, she placed the question of her intent in issue. "To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is substantially similar and reasonably near in time to the specific intent offense at issue." *United States v. Bell*, 516 F.3d 432, 443 (6th Cir. 2008) (internal quotation omitted). Since Ms. Williams's conduct at TGW was practically

identical and extremely close in time to her conduct at Haven, the district court properly admitted the evidence of that conduct for the permissible purpose of proving that Ms. Williams intended to defraud Medicare. Since the result of our analysis is the same under both abuse of discretion and de novo review, we need not resolve the intra-circuit split on the appropriate standard of review for the district court's Rule 404(b) ruling.

### 3. Confrontation Clause Claim

Ms. Williams next argues that the district court's decision to admit a chart summarizing Medicare claims relevant to Haven's operations violated her rights under the Confrontation Clause of the Sixth Amendment. Specifically, she claims that the Government's failure to produce the biller who submitted the claims in question for cross-examination renders the chart inadmissible. In response to Ms. Williams's objection, the district court found that the Confrontation Clause did not apply to the claims underlying the charts because they were not "testimonial" statements within the Supreme Court's understanding of that term.

The Confrontation Clause of the Sixth Amendment protects the criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. It has been interpreted by the Supreme Court to prohibit the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). This Court assesses whether a statement was "testimonial" within the meaning of the Confrontation Clause by asking if the declarant "intended to bear testimony against the accused." *United States v. Collins*, 799 F.3d 554, 576 (6th Cir. 2015) (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)). The inquiry is objective and asks if "a reasonable person in the declarant's position would anticipate his statement being used against the accused in

investigating and prosecuting [a] crime." *Id.* (quoting *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009)). Statements that are not "testimonial" are not subject to the strictures of the Confrontation Clause; they are admissible so long as admission is appropriate under the Federal Rules of Evidence. *United States v. Arnold*, 486 F.3d 177, 192–93 (6th Cir. 2007) (citing *Davis v. Washington*, 547 U.S. 813, 823 (2006)).

Ms. Williams suggests that the admission of charts summarizing several of Haven's disputed Medicare claims violated her right to confront the witnesses against her because the Government did not present the individual who actually submitted the claims for cross-examination. While the precise contours of Ms. Williams's Confrontation Clause argument are not clear from her brief, any viable Confrontation Clause violation centers on the Medicare claims underlying the chart—as opposed to the chart itself[6]—because the agent who prepared the chart was actually available for cross-examination at trial.

The viability of Ms. Williams's Confrontation Clause challenge thus depends upon whether the underlying Medicare claims constitute "testimonial" statements. The Medicare claims at issue on appeal were admitted into evidence under the "business records" exception to the hearsay rule. *See* Fed. R. Evid. 803(6). The Supreme Court has made clear that records kept in the ordinary course of business or government are generally not "testimonial" for purposes of the Confrontation Clause because they are "by their nature, made for a purpose other than use in a prosecution." *Michigan v. Bryant*, 562 U.S. 344, 362 n.9 (2011); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's

---

[6] While illustrative charts and diagrams are often not actually admitted into evidence, the chart disputed here was admitted as substantive proof under Federal Rule of Evidence 1006. As such, it could theoretically be the subject of a Confrontation Clause challenge in a case where the individual who prepared the chart was not available for cross-examination.

affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."). Elaborating on that observation, this Court has also suggested that the mere fact that a business record might foreseeably be relevant to a subsequent prosecution does not automatically transform the record into a "testimonial" statement. *See Collins*, 799 F.3d at 586 ("Although law enforcement officers may use [identification verification] records to track pseudoephedrine purchases, the [identification] system is designed to prevent customers from purchasing illegal quantities of pseudoephedrine by indicating to the pharmacy employee whether the customer has exceeded federal or state purchasing restrictions.")

Here, the Medicare claims in question were clearly submitted and prepared not for the purpose of litigation, but rather for the routine and ordinary business purpose of obtaining payment from Medicare. As the district court rightly noted, there is no indication that the claims documents in question were made "in anticipation of being presented in a Court relative to a case." While the possibility of an audit or prosecution for fraud is present whenever a claim for payment is submitted to the government, a reasonable person in the biller's situation does not intend to bear testimony against the billing entity each time they submit a claim. Much like the pharmacist who entered information into the identification verification system in *Collins*, the biller here cannot be reasonably said to have anticipated that the specific claims at issue would be relevant to a subsequent prosecution. At most, the reasonable biller anticipates that the claims she submits will be reviewed by the Government and subsequently approved or denied. Therefore, the Medicare claims at issue here are not "testimonial" for purposes of the Confrontation Clause, and we affirm the district court's admission of the summary chart.

4. Sentencing Claims

Ms. Williams's final claim on appeal is that the district court abused its discretion when it denied her requests for an "aberrant behavior" downward variance in her already below-Guidelines sentence. She also claims that the district court did not adequately account for her advanced age, her low risk of recidivism, and her lack of criminal history when imposing her sentence pursuant to the factors enumerated at 18 U.S.C. § 3553.

Our review of the district court's sentencing order is limited to reasonableness review under a deferential abuse-of-discretion standard. *United States v. Bazazpour*, 690 F.3d 796, 803 (6th Cir. 2012). We assess the reasonableness of sentences both procedurally and substantively. *See United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008). A sentence is procedurally unreasonable if the district court "fail[s] to calculate (or improperly calculate[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the [18 U.S.C.] § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). Substantive reasonableness requires the sentence imposed by the district court to be reasonable based upon the totality of the circumstances. *Id.*

With respect to Ms. Williams's argument that she should have received a downward variance under the "aberrant behavior" provision of the Sentencing Guidelines,[7] we normally do not review that question "unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *Bazazpour*, 690 F.3d at 804. A review of the transcript of Ms. Williams's sentencing reveals that the trial court was well-aware of its

---

[7] This provision of the Sentencing Guidelines provides: "The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b).

discretion to make a downward departure. We therefore reject Ms. Williams's appeal on that ground.

Finally, we reach Ms. Williams's claim that the trial court did not adequately consider the sentencing factors enumerated at 18 U.S.C. § 3553(a) when fashioning her sentence. Ms. Williams received a sentence that was substantially below the lowest end of the range recommended by the Sentencing Guidelines. While the trial court calculated the Guidelines range to be between 121 and 151 months, it sentenced Ms. Williams to only 60 months in jail. In explaining its sentence, the district court emphasized that its decision to issue a below-Guidelines sentence—despite the severity of Ms. Williams's offense—was motivated primarily by Ms. Williams's lack of criminal history and her low risk of recidivism. Instead of unthinkingly imposing a sentence tethered only to the Guidelines' recommendations, the district court engaged in a thoughtful and independent assessment of each of the § 3553(a) factors. That assessment ultimately convinced the court that a below-Guidelines sentence was warranted. This is precisely the type of reflective judgment that judges should exercise when sentencing criminal defendants under the Guidelines. Under these circumstances, we find that Ms. Williams' sentence is both procedurally and substantively reasonable and we affirm the trial court's sentencing order.

### B. Jamella Al-Jumail

Ms. Al-Jumail raises four questions for this Court's review on appeal. For the reasons articulated below, we affirm the district court's judgment against Ms. Al-Jumail in its entirety.

### 1. Sufficiency of the Evidence Claim

Like Ms. Williams, Ms. Al-Jumail claims that the evidence presented at trial was insufficient to support the jury's guilty verdict against her with respect to the conspiracy to

commit health care fraud count.  We analyze this claim according to the same standard applied to Ms. Williams's sufficiency claim.

Ms. Al-Jumail's only contention with respect to the sufficiency of the evidence is that the Government failed to produce sufficient evidence to permit a reasonable trier of fact to find that she ever entered into a voluntary agreement with another conspirator with intent to defraud Medicare.  *See Medlock*, 792 F.3d at 711 (requiring proof of voluntary agreement to defraud a health care benefit program).  While Ms. Al-Jumail does not dispute that she was in charge of Accessible's day-to-day operations or that Accessible did in fact defraud Medicare, she does allege that she was merely following her father's orders and that she lacked the requisite intent to defraud Medicare through her actions.  The testimony of Mr. Sharma and several Accessible employees told a different story at trial.  Mr. Sharma testified that he and Ms. Al-Jumail worked together to falsify documents to obtain permission to bill Medicare for home health services.  Additionally, two Accessible employees testified that Jamella orchestrated and oversaw an elaborate system of document fabrication in order to ensure that Medicare would not catch wind of the ongoing fraud at Accessible.  The Government's evidence at trial also indicated that Ms. Al-Jumail forbade Accessible's billing staff from discussing their concerns about Accessible's billing practices with anyone but herself or her father.  Taken together, this evidence was sufficient to permit a reasonable juror to infer that Ms. Al-Jumail knew of the fraudulent nature of Accessible's business model and that she had at least tacitly agreed to participate in Mr. Al-Jumail's scheme to defraud Medicare.

Like Ms. Williams, Ms. Al-Jumail also argues that the Government's failure to produce the biller who actually submitted the fraudulent claims to Medicare means that the jury's verdict

was based on insufficient evidence. For the same reasons discussed above with regard to Ms. Williams, this argument is unavailing.

Thus, the jury's verdict against Ms. Al-Jumail was supported by sufficient evidence and we affirm the district court's denial of Ms. Al-Jumail's Rule 29 and Rule 33 motions for judgment of acquittal.

## 2. Prosecutorial Misconduct Claim

Ms. Al-Jumail also asserts that certain statements made by the Government's lawyers during closing arguments amounted to unconstitutional burden-shifting entitling her to a new trial. In an attempt to convince the jury to find their clients not guilty, Mr. Al-Jumail's, Ms. Williams's, and Dr. Vigor's attorneys all made reference to the fact that the Government failed to produce the biller who actually submitted the disputed claims to Medicare as part of their closing arguments. After obtaining leave of the district court, the Government's lawyer said the following to the jury in rebuttal:

> Now, Mr. Johnson, Mr. Louissell, they complain that the Government didn't call Cassandra Cochran[, the biller]. Do we have the burden of proof in this case? Yes. Absolutely. Absolutely. Do they have to call one single witness? Nope. I have the entire burden of proof. But they could have called her. They could have.

On appeal, Ms. Al-Jumail argues that these statements impermissibly shifted the Government's burden of proof by suggesting that the Defendants were obliged to produce witnesses to establish their innocence.

This Court has long held that a criminal defendant's Fifth Amendment privilege against compelled self-incrimination entitles him to a new trial when a prosecutor's improper comments at trial flagrantly shift the burden of proof from the government to the defendant. *See United States v. Wimbley*, 553 F.3d 455, 461 (2009) (citing *United States v. Robinson*, 651 F.2d 1188,

1197 (6th Cir. 1981)). We apply a two-step analysis when we assess claims of prosecutorial misconduct: "First, we must determine whether the statements were improper. If we conclude the statements were improper, then we must determine whether the remarks were flagrant and thus warrant reversal [and a new trial]." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009) (internal citations omitted). Claims of prosecutorial misconduct are mixed questions of law and fact and we review them de novo. *Id.*

Our precedents hold that a prosecutor's suggestion that the defendant could have called a given witness is not improper when made in rebuttal to an implication by the defendant during closing argument that "the government failed to call a witness because the evidence would be favorable to the defendant." *United States v. Newton*, 389 F.3d 631, 638 (6th Cir. 2004) (describing *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993)), *vacated on other grounds*, 546 U.S. 803 (2005). *Clark* involved a set of facts highly similar to the facts here: Clark was questioned by two federal agents after being charged with several federal drug offenses. *Clark*, 982 F.2d at 966–67. The government opted to offer the testimony of only one of the federal agents, Agent Milhills, at Clark's subsequent trial. *Id.* at 967. At closing, Clark's attorney suggested that the government might have kept the second agent from the jury because he would not have corroborated Milhills's testimony. *Id.* In rebuttal, the government noted that Clark had the "opportunity," but "not the responsibility" to call the second agent if he believed that the first agent was lying. *Id.* This Court held that the prosecutor's remarks did not amount to misconduct because they "were made in response to defense counsel's argument that implied that the government had not called the other agent to testify because Milhills lied on the stand," and because they "did not imply in any way that the burden of proof was on the defendant to prove his innocence." *Id.* at 969.

A similar analysis guides our decision here. As in *Clark*, the Government's statement that the defendants "could have" called the biller was made directly in response to the suggestion of several defendants' closing arguments that the Government kept the witness from the jury because the evidence would not corroborate the testimony of the federal agent who testified about the claims that ABC, Accessible, and Haven submitted to Medicare. The Government in this case was even more unequivocal about who bore the burden of proof in this case than the prosecutor in *Clark*: the Assistant United States Attorney giving the rebuttal stated squarely that he had "the entire burden of proof" in the case and that the defendants did not "have to call one single witness." Because these statements were made in response to the defendants' claims that the Government was keeping unfavorable evidence from the jury and because the prosecutor clearly stated that the Government retained the burden of proof, the statements do not rise to the level of unconstitutional prosecutorial misconduct.

### 3. Erroneous Sentencing Calculation Claim

Ms. Al-Jumail claims that the trial court erroneously calculated her sentence because it did not make a sufficiently "individualized finding" as to the amount of loss attributable to her after she joined the conspiracy because the court never made a specific finding as to the date she joined the conspiracy. Because she did not raise this specific issue when the district court asked if Ms. Al-Jumail had any additional objections after receiving her sentence, we review this claim for plain error. *See United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004). To rise to the level of plain error, the defendant must show that the alleged error was "obvious or clear" and that it affected both the "defendant's substantial rights," and "the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir.

2008) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)) (internal quotation marks omitted). A finding of such error is "exceptional." *Id.*

The district court calculated Ms. Al-Jumail's offense level in part by applying a 14-level increase on the basis of the judge's determination of the intended losses at Accessible. Notably, the district court did not attribute the intended losses of any of the other relevant entities to Ms. Al-Jumail, as it could have. Since the evidence at trial suggested that, at a bare minimum, Ms. Al-Jumail was involved with the fraud at Accessible from its very inception, the district court's determination that Ms. Al-Jumail's conduct was responsible for all of the intended losses at Accessible was reasonable and well within the trial judge's broad discretion when calculating the offense level. *See United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013). Any error by the district court in calculating Ms. Al-Jumail's offense level cannot be said to be "obvious or clear." *Vonner*, 516 F.3d at 386. We therefore affirm the trial court's calculation of Ms. Al-Jumail's offense level.

### 4. *Apprendi* Claim

Ms. Al-Jumail's final claim on appeal is that the district court's order directing her to pay $589,516.69 in restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the jury never determined the loss attributable to her participation in the conspiracy. Ms. Al-Jumail did not raise this claim at the sentencing hearing, so we review it only for plain error. *Bostic*, 371 F.3d at 872–73.

In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. This Court subsequently held that restitution awards are not

subject to the *Apprendi* rule because "restitution statutes do not specify a statutory maximum." *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005). Despite the Supreme Court's expansion of the *Apprendi* rule to cover the facts used to assess criminal fines, *see S. Union Co. v. United States*, 132 S. Ct. 2344, 2357 (2012), this Court very recently held that *Southern Union* did not disturb *Sosebee*'s holding that restitution awards are not subject to *Apprendi*. *United States v. Churn*, 800 F.3d 768, 782 (6th Cir. 2015) ("*Apprendi* does not apply to the MVRA."); *United States v. Sawyer*, 825 F.3d 287, 297 (6th Cir. 2016) ("*Southern Union* did nothing to call into question the key reasoning at the heart of *Sosebee*, namely that the restitution statutes do not specify maximum awards.").

In light of the clear import of our precedents on this question, Ms. Al-Jumail's reliance upon *Southern Union* as support for her claim is misplaced. Because *Apprendi* review does not apply to restitution awards, the trial court did not plainly err by failing to submit the issue to the jury.

### C. Abdul Al-Jumail

Mr. Al-Jumail's only claim on appeal centers on the district court's denial of his motion to sever his trial from the trial of his daughter and co-conspirator, Ms. Al-Jumail. For the reasons articulated below, we affirm the district court's denial of Mr. Al-Jumail's motion.

Mr. Al-Jumail contends that the trial court should have granted his Rule 14 motion to sever his trial because a joint trial with his daughter would involve a substantial likelihood that the jury would infer that he was guilty if it found Ms. Al-Jumail guilty by virtue of their familial relationship. *See* Fed. R. Crim. P. 14. Because Mr. Al-Jumail did not renew his motion to sever at the close of all evidence, we review the district court's ruling only for plain error. *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002).

Because joint trial of defendants who were indicted together "promote[s] efficiency" and "serve[s] the interests of justice," Federal Rule of Criminal Procedure 14 has been interpreted to require severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or [would] prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537–39 (1993). "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540. Instead, defendants should point to discrete sources of "specific and compelling prejudice" to their trial rights or the jury's ability to reliably decide the case before severance will be granted. *Walls*, 293 F.3d at 966. Generalized allegations of prejudice associated with the "spillover of evidence" are almost never sufficient to require severance without more. *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014). Many of our sister Circuits hold that the mere fact that two defendants are closely related is not sufficient to require severance of a joint criminal trial. *See, e.g.*, *United States v. Nguyen*, 493 F.3d 613, 625–26 (5th Cir. 2007) (severance not required in joint trial of twin brothers).

Mr. Al-Jumail does not argue that any specific trial right of his has been prejudiced because of his joint trial with his daughter. Rather, he claims that the jury would infer that he was guilty if it found his daughter guilty. While it is probably true that a jury that convicted Ms. Al-Jumail would also be likely to convict Mr. Al-Jumail, that is because they were both co-owners and operators at Accessible, not because Mr. Al-Jumail was Ms. Al-Jumail's father or because the jury could not separately consider the evidence against each of them. In light of the generalized nature of Mr. Al-Jumail's allegations of prejudice and the weight of persuasive authority in favor of the proposition that familial relationships alone are not sufficient to require

severance under Rule 14, the district court did not plainly err in denying Mr. Al-Jumail's motion

for severance.

The judgments of the district court are **AFFIRMED**.